# City of Louisville *vs* Hyatt, &c. Same *vs* Evans, Same *vs* Mitchell. Evans *vs* Gray, &c.

APPEAL FROM THE LOUISVILLE CHANCERY COURT.

CHANCERY.

*Case 53.*

*Corporations. Corporate powers of Mayor and Council of Louisville.*

JUDGE MARSHALL delivered the opinion of the Court.

THESE five cases grow out of three several bills filed in the Louisville Chancery Court, to enforce liens given by the charter of Louisville, for securing payment for improving the streets of the city, from the proprietors of lots adjacent to the parts improved. In each of the three cases, the bill was dismissed as against the lot owners, and a decree rendered against the city, and in each case she has appealed from the decree. In two of the cases the complainant also appealed from the decree dismissing his bill against the lot owners. These two cases were formerly here, on the appeal of the *City of Louisville* vs *Hyatt, &c.* and *The City of Louisville* vs *Evans, &c.* when the decrees against the city were reversed, on the principles and for the reasons stated in the case against Hyatt, &c. reported in 2 *B. Monroe*, 177; and the cases were remanded for further proceedings and decree according to the principles of the opinion referred to. In that opinion the Court, in conformity with the case of the *City of Lexington* vs *McQuillon's heirs*, (9 *Dana*, 513,) maintained the constitutionality of the 9th and 10th sections of the charter of Louisville, which grant to the Mayor and Councilmen authority and power to cause the streets of the city to be graded, paved, and turnpiked at the expense of the adjacent lot holders; and also, that the power of grading as well as that of paving, is qualified by the requisition expressed only in the 9th section, which relates exclusively to paving and turnpiking, that there should either be a petition for the improvement from the owners of the property to be affected, or that it should

*Oct. 17.*
Cases stated and their object.

'City of Louis-
VILLE
vs
Hyatt, &c.

bc ordered by the unanimous consent of the Mayor and Councilmen, in council; and that this unanimous consent is not merely the unanimous vote of a board constituted for the transaction of ordinary business under the charter, but the unanimous consent of the Mayor and all the Councilmen of the city, to be given in council.

In each of the three cases, the work for which remuneration is claimed consisting in the case of *Evans* vs *Gray, &c.* of grading, paving and McAdamizing, and in the other two of grading only, was done under a contract made with the undertaker on the one side, and in the name of the city on the other, and executed by the Mayor, with the corporate seal, under the alledged authority of an ordinance of the Mayor and Councilmen, which contract specifies the price to be paid for the work, and promises, in effect, that upon its being completed and received by the Mayor and street committee of the city council, the necessary apportionment and orders should be made against the owners of ground fronting the same, for the collection of the amount due for the work. There was no petition from the lot owners in any of the cases. And after the two cases which were formerly here had been returned to the Court of Chancery, and in the regular progress of the case of Mitchell, which had never been before this Court, it was made to appear by certified copies of the proceedings of the Council, that there had not been, in either of the cases, a unanimous vote of the Mayor and all the Councilmen, in support of either of the ordinances or orders under which the contract was made and the work done; there being, in the two first cases, but a partial attendance of Councilmen, when the orders were passed, and in the last case, a want of unanimity in those who were present, of whom two actually voted against the order.

Assuming for the present, that these facts were properly brought before the Court in each of the cases, and assuming also, the correctness of the position above stated, as having been decided in the cases of *Lexington* vs *McQuillon's heirs,* and *Louisville* vs *Hyatt, &c.* it follows that as the Mayor and Councilmen had not, in the absence of a petition, any authority under the charter, to

Lots on squares in Louisville were not liable for an assessment made upon them by the Mayor and Councilmen, for grading and paving except it was

bind the lot owners on any square to pay for grading and paving the street in front of their lots, except by an act in which the Mayor and all the Councilmen should concur, there was no lien under the charter, and of course no case for its enforcement, and as the bills make out no ground of personal liability against the lot owners, but rest solely upon the efficacy of the orders of the Mayor and Councilmen, it follows, also, that they were properly dismissed as against the lot owners. And upon this hypothesis, the only question would be, whether, as the city had failed to furnish the proper means of coercing remuneration from the lot owners, it was not proper to decree against her the sums which, in carrying out the assumed agency between them and the undertakers of the work, her agents had ascertained and admitted to be due.

The propriety of such a decree is denied on the ground: 1st. That it was not intended that the city should be liable, but the undertakers agreed to look to the lot owners and not to the city. 2nd. That there was a mutual mistake as to the efficacy of the ordinance in question, and the city ought not to be made liable for it. And 3rd. That the Mayor and Councilmen had no authority to bind the city for the grading and paving of the streets, and therefore, the expense should not, and cannot be devolved upon the city, by their failure so to act as to bind the lot owners, or by their mistake in supposing that their action had been effectual for that purpose, but that the responsibility should fall upon the Mayor and Councilmen who caused the work to be done.

But in answer to the two first of these positions, it is to be remarked that any intention, or agreement, or stipulation, on the part of the undertaker, that he would look to the lot owners and not to the city for remuneration, was founded, not upon the understanding that he was to receive no compensation, if the lot owners were not bound to make it, but on the understanding based upon the acts and representations of the agents of the city, and upon her express undertaking, that such orders had been and would be made by the Mayor and Councilmen, as were effectual to secure it from them. If the mistake on this subject was mutual, it was produced by the assumption on

CITY OF LOUIS-
VILLE
vs
HYATT, &c.

made on their petition, or ordered by unanimous consent of Mayor and Councilmen in council assembled.

Further questions arising in the cases.

The Mayor and Council of the city of Louisville employed persons to grade and pave streets in Louisville, the undertakers agreeing to take the liability of the lot holders in payment—the Mayor and Council exceeded their authority by acting without the petition of lot holders or the unanimous consent of the

City of Louis-
ville
vs
Hyatt, &c.
_____
Counc il—h e l d
that the city was
bound for the
work and labor
to the underta-
kers. the part of the 'city, through her agents, that the orders were effectual. The facts on which their efficacy depended, were peculiarly within their knowledge, and the undertaker was not bound to enquire further, but was authorized to confide in their assumption. And after he has sustained the whole burden of the contract, and the city has derived the full benefit of his labor, induced by his faith in her promise to secure to him a remedy against the lot owners, she cannot escape the responsibility which, in equity and good conscience devolves on her for a failure to keep this promise, either on the ground of her own mistake as to a matter which she ought to have known and undertook to know, or on the ground of the undertakers mistake as to the same matter induced by her representations, or on the ground of his agreement not to look to her for pay, which was founded on her own promise to put it in his power to coerce it from the lot owners. The work was done at the request of the city, under a contract with her agents, made in pursuance of an ordinance competent to bind her, though not sufficient to bind the lot holders ; and upon the failure of her authority in this respect, she was bound under the law of principal and agent, and of contracts, to indemnify the other party.

How this conclusion might be affected by the conces-
The right of the
city Council un-
der its corporate
powers, is ample
to grade and
pave the streets
for the common
benefit without
express grant:
(4 Dana, 155.) sion that the Mayor and Councilmen had no authority to bind the city to pay for grading and paving the streets, or to appropriate the general funds, or to levy taxes for that purpose, need not be decided, because we are satisfied that such a concession should not be made. In the case of *Keasy* vs *City of Louisville*, (4 *Dana*, 155,) this Court seems to recognize the power of grading and paving the streets, as an inherent corporate right, even if not granted by charter; and although the corporate authorities would have no power independently of a legislative grant, to raise money by taxation for any purpose, yet as the streets belong not to individuals, but to the corporation, and the entire local public is interested in and benefitted by their improvement, and the local authorities are res|ponsible for their condition, there could be no doubt of their power to authorize the work of grading and paving to be done, without an express grant, and there would

seem to be no necessity for a special grant to enable them to appropriate any funds of the corporation which they could legitimately control. We find, however, in the legislative acts relating to the town of Louisville, express authority given to the Trustees, to regulate and repair the streets, and to appropriate the sums authorized to be raised by annual taxation, "for the benefit and improvement of the town." It may indeed be assumed, that the funds to be raised under the limited power of taxation conferred upon the Trustees, was never looked to as a source for defraying the general expense of grading and paving, but we think it clear that the Trustees having the control of the streets, being responsible for their condition, and having express power to raise and appropriate money for the improvement and benefit of the town, had a right, in their discretion, to raise and appropriate a portion of the authorized revenue for the grading and paving of the streets. And although by an act of 1812, and other subsequent acts, the Trustees were authorized to pave at the expense of the adjacent lot owners, the portions of any street extending from one street to another, upon the petition of three fourths, and afterwards, upon the petition of a majority of the lot owners, we think the grant of this special power which could only be exercised at the will of small sections of the town, was cumulative and did not destroy the pre-existing power of appropriating the general fund when it should be deemed necessary, and to the limited extent to which alone it could be done to the same purpose. And so the Mayor and Councilmen who have the same powers as the Trustees had, with others added to them, and who have within their control, to be appropriated at their discretion, a much larger fund, may appropriate a portion of it at their discretion, to the grading and paving of portions of the streets; notwithstanding the special and conditional power granted in the charter, of grading and paving at the expense of the lot holders.

We find an example of the co-existence and simultaneous exercise of these two powers in one of the cases before us, in which it appears that although the Mayor and Councilmen are specially authorized to pave the intersec-

City of Louis-
VILLE
vs
Hyatt, &c.

tions of streets at the cost of the owners of the adjacent corner lots, they have expressly undertaken that the city shall pay that part of the cost of the work provided for in the contract, and we presume such is the general, as we doubt not it is a legal and just practice in such cases.

The city, therefore, cannot claim exemption from lia-

*A competent board of the Mayor & Councilmen of the city have power to contract for grading and paving the streets of Louisville, and to tax the city for its payment.*

bility on the ground that the Mayor and Councilmen had no power to bind her to raise or appropriate the public revenues of the city for grading and paving. But as they acted under an ordinance passed by a board competent to bind the city, and for an object within their legitimate sphere, and the accomplishment of which must be presumed to have been highly desirable, and perhaps advantageous to the general body of the citizens, since it was opposed by the individuals particularly affected by it, the city should be completely identified with their action in her name and for her benefit, and responsible for their failures, mistakes, frauds, or default, as private individuals, under like circumstances, would be for similar miscarriages on the part of their agents; and as the city had, in effect, guarantied the equitable remedy against the lot owners, she was a proper party to the suit for its enforcement, when her power to furnish it, and the efficacy of the acts done by her public agents for that purpose, were brought in question. On this ground, as well as on account of the difficulty which might attend the legal remedy against her, and to avoid the effect of the agreement on which she now relies, that she was not to be looked to for pay, her liability was properly enforcible in this suit.

It is contended, however, that although the two cases of *Lexington* vs *McQuillon's heirs* and *Louisville* vs *Hyatt*, are to be regarded as settling, by the authority of judicial decisions, the constitutionality of the grant of power to grade and pave the streets at the cost of the lot holders, they are not to be considered as settling, by the same authority, the other two propositions, which have been deduced from them with regard to the identity of the limitations imposed upon that power, both as to grading and paving, and with regard to the extent of the unanimity required, when their exercise is not called for by a petition. But these propositions, though not discussed, are

unequivocally assumed in the cases referred to; and if it be conceded as contended for, that they are not essentially involved in the decision of the constitutional question, but depend solely upon the construction of the charter, it would be difficult to show that the construction thus assumed, is not to be regarded, at least in the case of *Louisville* vs *Hyatt*, as a judicial decision. That case, (which is now again before us,) was one of grading only, and the Court say: "without the unanimous vote of all the Councilmen and the Mayor, in council, the order was illegal and void. This (continues the Court,) is one of the chief conservative principles of the charter on this important subject, and should, therefore, be strictly enforced," and that the unanimity here spoken of extends, not merely to the Councilmen who may be present at an ordinary meeting, but to all the Councilmen of the city, is not only clearly implied by the expressions above cited, but is proved by reference to the case of *Lexington* vs *McQuillon's heirs*, (9 *Dana*, 523,) where the Court says: "And as the 11th section requires unanimity in the Council, no one square can be compelled to pay for work done on one of its streets or side walks, without the sanction of its representative," &c. which language necessarily implies that all the Councilmen must concur, since there is no provision that requires the presence or concurrence of a representative from each ward, that is, the representative of each square, unless the unanimity required for the exercise of the power in question demand the presence and concurrence of all.

We do not, however, rest this case exclusively on the ground that these questions have been judicially and authoritatively decided. Upon full examination and consideration of the charter, and the previous laws relating to the subject, and of the nature of the powers granted in the 9th and 10th sections of the charter, and the policy which dictated the limitations upon that power, we concur in the construction heretofore given to the two sections, and adhere most emphatically to the opinion, that the required unanimity of the Mayor and Councilmen is one of the chief conservative principles of the charter on this sub-

ject, and should be strictly enforced. Our reasons for this concurrence, we will proceed to state.

Upon the 9th section, which relates exclusively to paving, and which is quoted in the case of *Louisville* vs *Hyatt*, (2 *B. Monroe*,) and substantially in the case of *Lexington* vs *McQuillin's heirs*, (9 *Dana*,) from the 11th section of the Lexington charter, the only question is as to the extent of the unanimity required. The language is, "Provided, however, that the Mayor and Councilmen, by their unanimous consent in council, may cause any street, &c. to be paved, &c. at the costs of the owners of lots, &c. without a petition, &c." The plain import of these words, taken by themselves is, that there must be a unanimous consent of the Mayor and all the Councilmen, given in council, not out of doors. Our attention is called to the fact, that all grants of power contained in the original charter in which these sections are found, are made to "the Mayor and Councilmen," importing that they are referred to by that name as a body, and not as individuals. We have also been referred to the sixth section, which enacts, "that five Councilmen, with the Mayor, or in his absence, six Councilmen (there being at that time ten in all,) shall constitute a quorum to do business, except in cases of levying the taxes, or electing any officer of the city, in which cases eight Councilmen shall be present, and not less than five vote in the affirmative." And in the same section, it is provided, that the Mayor shall only vote in case of a tie. From all which, it is argued, that the words "by their unanimous consent in Council," mean by the unanimous consent of the Council, that is, of any quorum which may be assembled, and that the clause gives power to the Mayor and Councilmen, as a body, by the unanimous consent of the Council, constituted for ordinary business, to cause the streets to be paved, &c.

As upon either construction, the consent of the Mayor is required whenever he is present, the denial of a vote to him in the sixth section except in case of a tie, is alike inconsistent with both, and has no bearing on the question. But the fact, that while on all other subjects, the Mayor has only a casting vote, while on this subject,

his concurrence is requisite, though there be no disagree-ment among the other members of the Council, signali-zes this case from all others, and in itself furnishes some evidence that it was intended to be provided for in a pe-culiar manner, and therefore, that the provision should not be confounded with others. But this is not the only point of distinction. The whole structure and language of the provision, are different from other clauses granting pow-ers to the Mayor and Councilmen. In those other claus-es, the language uniformly is, "the Mayor and Council-men shall have power," &c. In all these cases the May-or and Councilmen are the mere recipients of the power which is conferred upon them by that name, without limi-tation as to the mode of its exercise, which mode, as to all other powers but the one now in question, is regula-lated by the sixth section of the act, prescribing what shall be a quorum for general business, and what for the particular cases therein named. But here the words, the Mayor and Council are named not as mere recipi-ents of a power which is to be exercised according to the provisions of the sixth section; they are introduced as agents exercising the power, and the mode of its exercise being at once regulated by the requisition, that it shall be by their unanimous consent in Council, the case by be-ing here specially provided for, is taken out of the provis-ions of the sixth section. Indeed, except the words "the Mayor and Councilmen," there seems to be no others in the clause now in question, which are used in any other clause, either for confering power, or limiting its exer-cise. The words, "their unanimous consent in Coun-cil," are no where else to be found, either singly or col-lectively, as descriptive of the powers or the mode of action, or the assembly of the Mayor and Councilmen. But in the sixth section, the word "board" is used, and is many times repeated as the name of the body or as-sembly formed by the meeting of the Mayor and Council-men. And we have seen that even the words "the May-or and Councilmen," denote in this clause, agents in-stead of mere recipients of power. There seems, there-fore, so far as language is concerned, to be no point of analogy between this and any other provision. This is a

CITY OF LOUIS-
VILLE
vs
HYATT, &C. reason why this provision should be construed by its own terms alone. The mayor and Councilmen in this, as in other clauses, means all persons coming under those denominations; for the power is conferred equally and collectively upon all, but to be exercised through the action of a common assembly or board, which, except when otherwise directed, may be composed of a majority only, and acts according to the will of the greater number of those present. A clause, "that the Mayor and Councilmen shall have power to do so and so," means that they shall have power, acting through the board, and by a majority of the voices present. "That they shall have power by the unanimous consent of the board," does not change the constitution of the board, through which the power is to be exercised, but only the vote by which the action of the board is to be determined. And if in such clause the word "may" were used, instead of the words "shall have power to," and the word "Council" instead of the word "board," although "board" and not "Council" is the word used in other parts of the charter, to designate the assembled body, the effect might be the same. But all this only proves, that if the clause had been, "that the Mayor and Councilmen, by the unanimous vote of the Council, may cause," &c., the power might have been exercised by the unanimous vote of an ordinary board. It does not prove that these words are identical with those actually used, or that the words actually used, should be, even if they might be, understood as importing the same thing, as the entirely different words above set forth. "The mayor and Councilmen, by their unanimous consent in council," is a phraze of different import from "the Mayor and Councilmen by the unanimous consent of the Council," and indicates a different and peculiar constitution of the board or Council." And if we could by transposition of words or any other allowable change in the phraze actually used, give to it the same meaning as might belong to the other phraze, we should not feel authorized to take such liberty. Because, first, the words used are plain and unequivocal in their import, and the presumption is, that they were used to convey the very meaning which they clearly import. 2d. There is not

only no necessity from the ambiguity of the words, to resort to other parts of the charter for their interpretation, but on looking into the other parts, we find no special rule or provision which should govern the interpretation of these words, and nothing which requires their natural meaning to be departed from in order to make the whole instrument harmonize. For this is itself a special provision, distinguished not only by its language and structure, from all other provisions, but also by the nature of the subject to which it relates, and of the power which it confers and regulates. And, 3d. When we look beyond the mere words, to the subject to which they relate, and the power which they convey, and to the policy or principle which may be supposed to have dictated the restriction upon this power, we think there is ample reason for giving to the language which imposes that restriction, the greatest force and efficacy of which it is fairly susceptible. And for this reason we should adhere to the construction requiring the unanimous consent of the Mayor and all the Councilmen, even if it were conceded that the words are susceptible of another construction varying from their natural import.

Conceding that the Legislature might have conferred upon the Trustees, or upon the Mayor and Councilmen, acting in an ordinary board, or acting by a concurring majority of all, the power of paving whenever they should think proper, at the expense of the lot owners, it cannot be denied that such a power, subjecting to a greater or less extent the interest and property of a few individuals to the will of a majority, is not only liable to be abused, but offers temptations to abuse such as have never yet failed, sooner or later, to produce flagrant instances of injustice and oppression. And as it should not be presumed that the Legislature has ever been either unaware of this tendency or disposed to countenance it, there should be clear and unequivocal evidence of an intention to grant such a power in order to justify its establishment by inference or construction. Even the acts of 1812 and 1814, the first upon the subject in which the Legislature in effect determines that the Main street of Louisville, between 3d and 6th cross streets shall be paved, at the ex-

CITY OF LOUIS-
VILLE
vs
HYATT, &c.

pense of the lot owners of that part of the street, when-
ever the Trustees may direct, reserve to the owners of
lots in all other parts of the town, the power of determin-
ing, according to their own sense of public and private
interest, whether, and at what time the several sections
of streets adjoining their lots, and to the extent of the
square, shall be paved at their expense, requiring three-
fourths of the lot owners on any such section, to express
this determination before the Trustees were authorized to
coerce the minority. By this latter provision the princi-
ple is established that the burden of extending the pave-
ment beyond the designated portion of Main street, may
be imposed upon the sub-sections of the town, not at the
will of a majority of the whole town who might derive the
advantage without feeling the burden, but at the will of
the particular sub-section which is to bear it. And as the
expression of that will by three-fourths, or even as after-
wards allowed by a simple majority, of those who were
to bear the burden, would be sufficient evidence of the
common interest of that section, the provision secured
at once the entire section from oppression by a majority of
the town, and the minority of the section from oppression
by the sectional majority. It should not be doubted that
in determining to empower the Trustees, at their pleasure,
to cause the designated portion of Main street to be pav-
ed by the adjoining lot owners, the Legislature paid due
regard to the principle which the same acts established
with regard to other portions of the town. But be this as
it may, the remaining sections of the town were secured
against any power in the Trustees, even by unanimous
vote, to compel them to pave their sections against or
without their consent. And so stood the law until the
act of incorporation was passed.

By usage or by the effect of the act of 1812, and in
consequence of the inadequacy of the town revenues,
the burden of paving has generally devolved upon the
owners of the adjoining lots. The lots may be supposed
to be held, subject impliedly, to the burden of paving,
when upon a just estimate of public and private interest,
it might be properly required. The great difficulty con-
sists in so regulating the power which is to estimate these

interests, and make the requisition as at once to answer the public exigencies and to guard the minor interests against oppression and undue inequality of burden.   We have seen how it was lodged and regulated prior to the enact-ment of the charter in 1828; and as it cannot be doubted, that the disposition which had then been made of it was dictated by a regard for the sectional interests which were to be affected by its exercise, and by a sense of the ne-cessity of protecting those interests against the will of a majority of the town, there should be some greater evi-dence of an abandonment of these conservative princi-ples, than can be furnished by mere plausibility of con-struction against the natural meaning of words, before it can be established that the Legislature had, in the charter, delivered up these minor interests, without the shadow of protection, to the uncontrolled will of a majority.   Ex-perience may have shown that too strong a check had been placed in the hands of the sub-sections, and that the pub-lic interests and wishes were thereby unnecessarily ob-structed; and this may have been a sufficient motive for diminishing the power of resistance in the sections, and increasing the power of action in the city at large, through her public representatives.   But where is the motive for placing the power broadly and without restriction or qual-ification, in the hands of a majority?   The requisition of a unanimous concurrence of the Mayor and all the Coun-cilmen, could not have been [expected to present a se-rious obstacle to the exercise of the power, whenever, in view of the public and private interest involved, its exercise would be just and proper; and as it might have been expected to prevent its exercise in cases of a palpa-bly different character, and as upon any other construc-tion of the charter, there is nothing to prevent the prema-ture and oppressive action of a majority, we should be disposed rather to establish this requisition to the extent indicated, by construction and inference, than to destroy it as it stands upon the plain words of the charter, by a resort to such means.   We adhere, therefore, to this re-quisition as heretofore expounded, as the only conserva-tive principle provided by the charter, under which, in the case of opposing interests, the local and weaker interest

can find any protection against the injustice which may, sooner or later, be expected from the abuse of power by an unchecked majority.

The considerations on which this reasoning is founded, and which have been adverted to in general terms only, apply with still greater force to the power of grading at the cost of the local lot owners, than to that of paving. For the danger of abuse and oppression in the exercise of the latter power, arises only from the inequality of the burden, when the same expense of paving is thrown upon a few persons owning lots of comparatively little value, on a section of a street little used, as has been or may be imposed upon the many owners of lots of great value, upon an equal section of a street thickly populated and crowded with business and passengers. But the inequality of burden in grading the streets, consists not only in all of these circumstances, but in this additional one of great importance : that there may be great difference in the cost of grading the same extent of street, in different parts of the town. And moreover, from the excavations or embankments required in grading particular sections, the access to the adjacent lots may be more or less obstructed, and their value diminished, or for a time destroyed, unless kept up by large expenditures on the part of their owners. If then it be true that by custom and the necessity of the case, the tenure of the town lots is such as to subject the owners to the duty of grading and paving the adjacent streets, when upon comparison of public and private interests, they may be justly required to do so ; and if the power of determining when this burden shall be imposed, may be vested in the public authorities of the town, the greater degree of hardship and oppression which may be inflicted by an undue exercise of the grading power, would lead us to expect, from the wisdom of a provident and just legislation, a check at least as efficient upon that power, as the one which is placed upon the power of paving; and looking to the similarity and connection between the two subjects, it might be supposed *a priori,* that little, if any discrimination would be made in the conditions which would be imposed upon two powers so nearly identical in their na-

ture and operation, and of which the one is essentially an incident or means necessary to the execution of the other. Indeed, as grading preparatory to paving, if not strictly a means necessary to the end, is a step in the progress of the work, without which the end cannot ordinarily be properly accomplished, it might be supposed that the power of paving, at the cost of the lot owners, as granted by the acts of 1812 and 1814, was understood and intended to include the power of grading, at the like charges, so far as grading might be a necessary preparation for the paving which should be authorized to be done under these acts. And this inference derives some confirmation from the fact that there was no express grant of the power of grading at the cost of the lot owners until the act of 1819. There must, in the interval of seven years, have been a considerable amount of grading and paving done in the central and more populous parts of the town. And if this grading had been done at the public expense, there would have been a seeming injustice in changing the system in contemplation of an extension of the pavements into the remote and more thinly settled sections. But be this as it may, and however the cost of grading may have been borne prior to 1819, it was then deemed prudent, if not necessary, to obtain an express grant of the power of grading the streets at the cost of the adjacent lot owners. The 4th section of the act of 1819 enacts, that whenever the Trustees of said town shall determine to level and graduate any of the streets preparatory to the pavement thereof, they are hereby invested with power to level and graduate the said streets, and assess and apportion the expense thereof, among the owners of the lots adjoining said streets, &c. This section certainly did not originate the power of grading the streets preparatory to paving, and it may not have originated the power of grading at the expense of the lot owners. It was intended to grant or to declare this latter power, that is, the power of charging the cost to the lot owners, whenever the Trustees should determine to grade preparatory to paving. The power attaches whenever the Trustees shall determine, &c. But when or under what circumstances was it contemplated that they should deter-

City of Louis-
  VILLE
    vs
Hyatt, &c.

mine to grade preparatory to paving? When could they properly so determine? When had they previously made such a determination? Had they even caused a street to be graded as a preparation for paving it, before they had authority to pave it? We presume not, and we suppose it was not contemplated that they would do so in future. The grading referred to in this section, being evidently regarded merely as a preparation for paving, and being thus inseperably connected with it, the Legislature cannot be presumed to have intended to grant to the Trustees an independent power of grading for the purpose of paving, or preparatory to it, to be exercised when they had no power of paving, and might never have. The grading, as a mere preparation for paving, would not be expected to be done or ordered while there was no authority to do the paving. Until there was such authority, the contemplated case in which the power of grading, at the cost of the lot owners, was intended to attach, would not occur. The power of grading preparatory to paving, was therefore intended to be dependent on that of paving. And as the barren power of paving at the public expense, was certainly not in contemplation, but only the power to pave at private cost, which could not arise as to any section of a street until there had been a petition from the lot owners, so the power to grade any section at private cost, would not attach until there had been such a petition for paving. For until then there would be no authority for paving, and it could not be known when, if ever, such authority would be given.

Of these two powers, that of paving was evidently regarded as the principal, and was, therefore, for a long time the only one specially provided for. If the other passed as an incident, it was of course dependent upon it, and subject to the conditions attached to the principal power. But whether it passed by the first grant or not, it was not necessary, in order to subject it to the same conditions to which the principal power was subjected, that they should be expressly imposed in the subsequent special grant. It is sufficient that it was granted as a subordinate, incidental, and dependent power, to be attached to and exercised with, or as a part of the princi-

pal power. This, we think, was done in the act of 1819, which regards and grants the grading power as an incident to the paving power, and in effect places it on the same footing as if it had passed, as an incidental power under the original grant of the principal, and therefore subjects it to the condition or qualification, that there should have been a petition for paving before this power of grading could be exercised.

CITY OF LOUIS-<br>VILLE<br><i>vs</i><br>HYATT, &c.

How stands the question then, upon the act of incorporation of 1828? In that act, as in the previous legislation, the case of paving is first provided for. The 9th section, which is quoted in *Louisville* vs *Hyatt*, (2 *B. Monroe*,) grants and regulates the power of paving and turnpiking, and makes detailed provisions for the assessment and collection of the cost. After which, the 10th section proceeds immidiately to enact, "that when any street in any square shall have been paved or turnpiked, the Mayor and Councilmen shall have power to cause the side-walks to be paved with stone or brick, and to apportion the cost and expenses on the owners of lots, &c. and a lien is given for the same; and the Mayor and Councilmen shall have like authority and power to cause the streets and alleys to be filled, levelled and graduated for the purpose of carrying off the water, or preparatory to paving or turnpiking, at the cost and expense of the lot owners, for which it gives a lien, and provides for collection by reference to "the previous section."

Did the Legislature intend, in enacting this clause, to continue the powers of grading and paving, in the same relation of dependence of the former upon the latter, which previously existed, modifying alike the conditions on which each might be exercised, or was it intended to relieve the power of grading at the cost of individuals, the most dangerous of the two, from all previous restrictions, and to vest it as an absolute and independent power of imposing this burthen upon the sectional minorities in the will of a bare majority of a quorum, or even of a bare majority of all the Councilmen? Waiving a reference to those general considerations which might be brought into view in answering this question, and confining ourselves to the face of the charter, it is to be re-

marked that the object of the grading as a preparation for paving, is still kept expressly in view in this clause. And if that were the only purpose expressed for which the grading is authorized to be done, we should be clearly of opinion that as the charter regarded the grading merely as a means of preparation for paving, it might on this ground alone, be understood as establishing or recognizing the same relation of dependence between the two powers which existed before. For as the grading would be but the authorized means for the attainment of a certain end, which is itself authorized only *sub modo*, it should not be presumed that the means were intended to be used independently of the end, but only when those conditions concur under which the end itself is allowed to be attained. And we are not sure that the force of this argument is materially impaired by the expression of another purpose to be accomplished by the grading power. It had never been deemed necessary to authorize the Trustees of the town to cause the streets to be graded for the sole purpose of carrying off the water, and as in the case of streets whose population and business would not justify their being paved, the water which would fall upon them might be sufficiently carried off by ditches without the expense of a general grading of the street, there would seem to have been no adequate reason for authorizing the Mayor and Councilmen to burden the lot owners with the unnecessary expense of grading the street for that single purpose. It is possible then, that the object of carrying off the water, which should always be regarded and accomplished if it can be done at reasonable expense, in grading the streets preparatory to paving, was expressed in the clause before us, not for the purpose of indicating that object as being in itself a sufficient cause for exercising the power of grading at the cost of the lot owners, but for the purpose of indicating it as one of the objects with a view to which the grade or inclination of the streets might be determined, and of thus placing beyond question, the power of the Mayor and Councilmen in their discretion, to fix the grade so as to accomplish that object whenever they should determine that a street or part of a street should be graded preparatory to paving.

.This would be the certain effect of the clause, if "and" was used instead of "or," which may have been inadvertently inserted, as connecting the two purposes for which the grading is authorized; and if this should not be presumed, still as the object of preparing the streets for paving was undoubtedly the principal purpose for which this power of grading was given, this principal object would properly give character to the power, and being itself incidental and subordinate, would make the power so. But if this view be not conclusive, we think the dependence of the power of grading, as granted in this clause, upon the power of paving, as granted in the preceding section, is sufficiently indicated and established by the use of the word "like," which is intended to qualify it by reference to a power previously granted. If the clause relating to the power of grading had been placed at the commencement of the 10th section, there could have been no doubt that the words "like authority and power," would have referred directly to the power of paving in the previous section; and would have annexed to the grading power the same limitations and conditions as are therein expressed. But this natural order of the two provisions is disturbed by inserting between them the provision relating to the paving of the side walks, with which the 10th section commences, and it is insisted that this power being the last antecedent, the word "like" should be referred to it, and not to the power conferred in the preceding section. The general rule which indicates such a reference is however subject to exceptions, and we think it might be shown that there are sufficient grounds for establishing the exception in this case. Besides the general considerations which tend to show the propriety of placing the two powers of grading and paving the streets on the same footing, we assume that the preparation of the streets for paving, was the principal, if not the only object of the grading power; and this establishes a connection between the two subjects, which entitles them to be considered together, and renders it proper and probable that the paving power having been regulated in detail, the grading power should follow and be regulated by reference to it. The reference made in the grading clause

City of Louis-
VILLE
vs
Hyatt, &c.

to the details for the assessment and collection of the cost in the preceding section, shows that the 9th section was the one in view; and the unnecessary and perhaps inadvertent interpolation between these two clauses, of the provision for paving the side walks, which is perfect in itself, and might be removed entire, to the end of the 10th section, without impairing its effect or changing any of its words, should not be allowed to interrupt this reference of the word "like," by which the grading power is qualified, and especially if the effect would be to change essentially, the condition or quality of this last named power. But an accurate scrutiny into the structure of the 10th section, will demonstrate that a reference of the word "like," to the last antecedent, which is the power of paving the side walks, would deprive the word of all effect, or else would result in subjecting the grading power to substantially the same qualifications as if the reference were made directly to the power granted in the 10th section. It must be assumed that the word "like," to whatever antecedent it be referred, was intended and is entitled to have a distinct operation and effect in establishing between the two powers which it brings into comparison, a similarity or identity in some point in regard to which such similarity or identity is not established by other words in the clause to which that word of reference belongs. If there be no room or ground for giving it such effect, when referred to the next preceding antecedent, this would be a strong reason in addition to others above mentioned, for carrying it back to the more remote antecedent. For it is evident the word "like," was intended to have a qualifying effect, by reference to something which is before expressed, and it must, if possible, have its intended effect. Taking the reference then, to be the power of paving the side walks, which is the last antecedent, the question arises, in what respect as indicated by the connecting word "like," is the power of grading intended to be made similar to the power of paving the side walks? Or, in what particular point was the word "like" intended to establish a similarity? And we say, not in the fact that the two powers may be exerted by the Mayor and Councilmen, in an ordinary board,

for this is as fully expressed in the one case as in the other, by the words vesting the power. Nor is it in the fact that the cost of the thing to be done in each case, is to fall upon the lot owners, to be assessed proportionally, and to be a lien upon their lots. For all this is more fully expressed in the last than in the next preceding clause; which circumstance, as well as the express refer-ence which the last clause makes to the preceding section for the regulation of these details, tends to show that the grading clause should have come immediately after the 9th section, and that the clause for paving the side walks should have followed both. Upon a strict analysis of the two clauses, it will, we think, appear that there is nothing in which they can be alike, and in which they are not made so without giving any effect to the word "like," ex-cept in the particular that the power of paving the side walks is dependent upon a previous authority in the May-or and Councilmen, to pave the street, and a previous exertion of that authority, at least so far as to have deter-mined to pave it. If then the word "like" refers to the nearest antecedent, and is to have any effect in determin-ing the character of the power to which it is prefixed as a qualifying term, it makes it dependent upon a pre-ex-isting authority and determination, or at least upon a pre-existing authority to pave the street before the Mayor and Councilmen can order it to be graded; and that authority can only have existed in consequence of a petition from the lot owners, or by the unanimous consent of the Mayor and Councilmen in council, that is, by a unanimous vote of all.

We are thus carried, even by the rule which has been relied on as fixing the reference, through the last antece-dent, and by means of it, back to the first antecedent, which is the power of paving the streets as defined in the 9th section; and the certainty thus produced, that the grading power was intended to be subordinate to, and dependent on that of paving, as defined in the 9th section, renders it almost certain that the word "like" was intended and understood to refer directly to that power, and thus to fix upon the grading power at once, and without the necessity of any subtle analy-

sis, the same conditions of a petition from the lot owners or a unanimous vote as required in the 9th section. This construction might, perhaps, be necessary to enable the Mayor and Councilmen to grade a part of a street at the expense of the lot owners, since the grading clause in the 10th section, mentions streets and alleys, and not portions or sections of streets: *Bowlinggreen* vs *Hobson*, (3 *B. Monroe*, 478.) There would, at any rate, be more difficulty in establishing such a power by referring the word "like" to the power of paving the side walks, than by referring it directly to the power of paving in the previous section. But it is not necessary, in this case, to decide conclusively between these two refeiences or constructions of the word "like," nor to trace the difference, if there be any, between the consequence of adopting the one or the other. The conclusion which either of them must establish, is sufficiently broad to cover this case, and to show that as there has been neither a petition nor a unanimous consent of the Mayor and Councilmen for either paving or grading the sections of streets for which compensation is sought in these cases, the ordinances and orders by which it was attempted to impose a liability for the cost of the work, upon the lot owners, were unauthorized and ineffectual for that purpose.

It remains only to say, that in the case of Mitchell against Rogers, &c. the insufficiency of the city ordinances relied on by the complainant, having been set up in the answer regularly filed, and being proved, there is no room to question the right of the defendants in that case to have all the benefit which can arise from the insufficiency and illegality of the orders in that case. In the case of *Hyatt, &c.* vs *Stokes, &c.* this matter was not regularly set up until after the return of the case from this Court to the Court of Chancery, when the defendants answered a bill of revivor, rendered necessary by the death of the complainant, Hyatt; and as the copies of the ordinances filed by the complainant and relied on as the basis of his remedy, had been so certified by the city officers, as to furnish *prima facie* evidence that they had been legally passed by competent authority, we think neither

the complainant nor the city have any right to object to the delay in discovering and relying on the defects. The same consideration applies with even greater force to the case of *Evans* vs *Gray* since the ordinance, which the complainant exhibited in that case, and on which his claim rested until after the cause had been returned from this Court, and an interlocutory decree had been pronounced against Gray, &c. was not only deceptive in importing that it had been passed by a sufficient vote, but also in importing to have been passed at a time when there was, in fact, no meeting of a quorum of the board, and when no such ordinance was attempted to be passed. And as these facts, as well as the insufficiency of the orders actually passed, were made to appear in the amended answer afterwards allowed to be filed, we cannot say that the Chancellor abused his discretion in setting aside the interlocutory decree, and letting in the answer, or that the defendants should not be allowed the benefit of the matters therein set up, as in the other cases.

We conclude by saying, that we have duly considered the suggestion that the affirmance of these decrees may do injustice by taking from these lot owners and throwing upon the city at large, a burden such as other lot owners have been and will be obliged to bear in grading and paving the streets in their respective squares. But we find no basis laid in the case, nor are we satisfied that there could be one, for avoiding such a consequence. The claim is attempted to be enforced solely on the authority of the incompetent ordinances of the city Council. No case has been made out in which the Court can say, if indeed it would have a right to judge, that the grading and paving which were done, ought, on the principles which have been stated, to have been done. when they were ordered, or ought even now to be ordered at the cost of the lot owners, if they remained undone; they are not shown to have been required by the public necessities, nor by the interest of the lot owners; nor is any distinct advantage shown to have resulted to them from the work done. On the contrary, in some of the cases the work would seem not to have been essential to the public convenience, while it was actually injurious to the

adjacent lots, and from the depth of the excavations,. would have imposed an extraordinary expense upon the: lot owners, had the cost been coercible from them.

Wherefore, the decree is affirmed in each of the cases.

*Loughborough* and *Wolfe* for the city; *Pirtle* for. Mitchell and Stokes; *Guthrie* for Evans, Gray, and Hyatt.