New Haven, Middletown & Willimantic R. K. Co. *v.* Town of Chatham.

under this contract, he is not now in a condition to enforce those rights, and will not be until he has done at least all in his power to place the defendant in *statu quo.*

We therefore advise the Superior Court to render judgment for the defendant.

In this opinion the other judges concurred.

—————— ♦ ♦ ♦ ——————

## THE NEW HAVEN, MIDDLETOWN & WILLIMANTIC RAILROAD COMPANY *vs.* THE TOWN OF CHATHAM.

The town of Chatham, for the purpose of aiding in the completion of a railroad that was in the course of construction through the town and which was in an embarrassed condition, passed a vote, under authority of the legislature, to guarantee not exceeding $40,000 of certain bonds which the railroad company was authorized to issue, such guarantee to be made after the road was completed. The resolution authorizing this action of the town provided that the vote should be by ballot, and the warning of the town meeting, which was recorded upon the records of the town, stated that the vote would be so taken, that ballot boxes would be open for the purpose, and that those in favor of the proposition would deposit ballots with "Yes" upon them, and those opposed, ballots with "No" upon them. The record of the meeting by the town clerk was, that "the resolution was adopted, 'Yes' 178, 'No,' 86." The vote was in fact taken by division of the house, and not by ballot, but neither the officers of the town nor any person in its behalf ever claimed or gave notice that it was not taken by ballot, until more than three years after, and until long after the railroad company had in good faith, and with the knowledge of all the inhabitants of the town, issued the bonds which were to be guaranteed and delivered them to contractors, who had performed work, furnished materials, and expended money in reliance upon them, the contractors taking them with an order upon the town for its guarantee of them when the work was completed. Held that the town, as a municipal corporation, and the inhabitants of the town, were estopped from claiming that the vote was not legally taken. [The Chief Justice dissenting.]

And held that the town was estopped from availing itself of a correction of the record by the town clerk, afterwards made under an order of the Superior Court, upon the application of one of the tax-payers of the town, showing that the vote was taken by a division of the house and not by ballot.

It appeared that when the vote was taken the treasurer and managing director of the railroad company was present, and saw how it was done, but that he was not acting officially, and that his knowledge was not conveyed to any of

the other directors of the company.    Held that the railroad company was not affected by his knowledge.

The town had previously subscribed for a large amount of the stock of the company, and issued its bonds in payment, under what it supposed sufficient authority.    The town now claimed that its acts were unauthorized and the railroad company indebted to it for the money received.    Held that, in view of the object for which the town had undertaken to guarantee the bonds, and of the use that had been made of them for the promotion of that object, and of the equitable rights of contractors and material-men, the town could not set off this claim upon the company against the claim of the company for the guaranteeing of the bonds.

As the contractors received the bonds not as payment of their claims, but as a means of procuring payment, the railroad company on the one hand still retained an interest in them, which enabled it to maintain a petition for a mandamus to compel the town to make the guarantees, while on the other the equitable interest of those who had performed work and furnished material in reliance upon the bonds, was to be fully recognized by the court.

Although the vote of the town directed the selectmen to guarantee in behalf of the town an amount of bonds "not to exceed $40,000," yet the town had by the whole transaction and by its arrangement with other towns interested in the completion of the road, so far committed itself to that full amount, that no discretion was left to the selectmen to fix upon any less amount.

APPLICATION for a mandamus, to compel the respondent town to guarantee certain bonds executed by the petitioners; brought to the Superior Court in Middlesex County.    The petitioners made the application in the name of the State as well as in their own.    The court issued an alternative mandamus, to which the respondents made return.

The facts, which were found by a committee, were the same with those stated in the report of the case of *Douglas* v. *Town of Chatham*, 41 Conn. R., 211, with the following in addition.

The vote of the town of Chatham of October 14th, 1871, stated in the report of the case referred to, (id., 217,) was passed under authority of a resolution of the General Assembly passed at its May session in the year 1871, which was as follows:

" The towns named in the first section of an act incorporating the New Haven, Middletown & Willimantic Railroad Company passed May session A. D. 1867, [the town of Chatham being included,] are hereby severally authorized and empowered to guarantee the payment of bonds authorized to be issued by said railroad company at this session of the Gen-

eral Assembly, to an amount that shall not exceed the sum of $700,000 in the whole, and in no event to exceed the investment said towns may already have in said railroad. Provided however that at any town meeting called for acting under the provisions of this resolution, the vote upon the question of guaranteeing said bonds of said railroad company shall be taken by ballot, and the ballot boxes shall remain open for the reception of such ballots not less than two hours."

The warning of the meeting at which the town acted upon the matter was as follows:

"SPECIAL TOWN MEETING. To the legal voters of the town of Chatham: You are hereby notified that a special meeting will be held on Saturday, the fourteenth day of October, 1871, at the old Methodist church, in the village of East Hampton, to consider and vote upon the following questions:

"Will the town of Chatham authorize and direct the selectmen to endorse and guarantee an amount of second mortgage bonds of the New Haven, Middletown & Willimantic Railroad Company, that shall not exceed in amount the sum of forty thousand dollars, said bonds to be used to aid in the completion of said railroad, on and after such time as said road shall have been graded, the track laid permanently and cars shall have passed over said road from the city of New Haven to the village of East Hampton, in said Chatham?

"Further—Will they appoint a financial committee whose duty it shall be to act in behalf of said town, to receive from the selectmen the endorsed or guaranteed second mortgage bonds of the railroad company, and transfer said bonds to said railroad, and receive therefor from said company in its second mortgage bonds, double the amount of the bonds guaranteed, whenever said New Haven, Middletown & Willimantic Railroad Company by its authorized agents shall have complied with the conditions prescribed by the legal voters of the town of Chatham?

"Further—Will the legal voters of Chatham authorize said financial committee to select one member from their number to act as an agent for the town of Chatham, in representing and voting on all stock or bonds now held or that may here-

after be held in or against said railroad company by said Chatham, in each and every meeting of the stockholders of said railroad company?

"The meeting will open at one o'clock P. M., the boxes will be opened at two o'clock P. M., and remain open until five o'clock. Those in favor of the above propositions and conditions presented to said meeting, will deposit a ballot with the word ' Yes' upon it, and those opposed will deposit a ballot with the word ' No' upon it. Dated at Chatham, October 9th, 1871." (Signed by the Selectmen.)

The record made by the town clerk of the action of the town at the meeting was as follows:

"At a special town meeting of the legal voters, legally warned and held at the M. E. Church in East Hampton, October 14th, 1871, Samuel Skinner, Chairman.

" *Voted*, That the resolutions prescribed in the warning be adopted, Yes, 178; No, 86.

" *Voted*, That Philo Bevin, Horace Johnson, John Carrier, A. H. Conklin, Harrison Brainard, Cyrus Hurd, Charles H. Strong and Warren Veasey, be appointed a financial committee to carry out the conditions prescribed in the warning for this meeting.

" *Voted*, That this meeting adjourn *sine die*."

No claim was ever made by the selectmen of the town, nor by any one on behalf of the town, that the vote upon the passage of the resolutions was not taken by ballot, until after the present suit was brought, which was in November, 1874. Upon the hearing before the committee in the present case the town offered to prove by parol testimony that the vote was taken by dividing the house, and counting the affirmative and negative votes, and was not taken by ballot. The petitioners objected to this testimony, on the ground, 1st, that the only proper evidence of the vote and manner of taking it was the certified copy of the record of the meeting by the town clerk, which copy was already in evidence; and 2d, that from the facts in evidence it appeared that, relying upon the record of the vote as a true record, the petitioners and contractors upon the railroad had expended labor, money and materials in

the construction of the road for the benefit of the town, and that it was now too late for the town to set up the defense that the vote was taken in any other way than by ballot, and that it was estopped from so doing. The committee sustained the objection and rejected the testimony so offered.

It was found, upon a supplemental hearing in the case, that, upon an application for a mandamus brought to the same term of the Superior Court at which the report of the committee was made, by one of the tax-payers of the town of Chatham, to compel William H. Bevin, who was then the town clerk, but not the town clerk at the time the record was made, to correct the record of the vote, and upon a full hearing of the parties, a peremptory order was made directing him to correct the record so as to conform to the fact, by recording, in addition to what before appeared and at the end thereof, the following words, viz: *Said vote was taken by a division of the house and a count, and not by ballot.* In addition to which and at the suggestion of the court a conspicuous memorandum of the correction was inserted by him on the same page in the record book as that on which the original entry was made, explaining the time when, and upon whose application, and by what order it was done.

It was also found that Allyn M. Colegrove, at the time the town meeting in question was held, was the treasurer of the petitioners and a managing business director, and that he was present at the meeting and knew that the vote was otherwise taken than by ballot, but that he was not there in his official capacity and character, and that his personal knowledge of the fact was not communicated to or known by the other directors, but that they all had knowledge of the form of the vote as it was originally recorded.

The facts with regard to the contracts made by the petitioners for the completion of the road in reliance upon the vote of the town of October 14th, 1871, and their issuing of bonds to contractors to be afterwards guaranteed by the town, and of the performance of work, the furnishing of materials and expenditure of money by the contractors in reliance upon the vote and in expectation of the guaranteeing of the bonds

by the town, and other important facts found by the committee, are sufficiently stated in the opinion of the court.

Upon the facts so found the case was reserved for the advice of this court.

*Warner* and *S. A. Robinson,* for the petitioners, contended that the town of Chatham was estopped from claiming that the vote upon the resolution of October 14th, 1871, was not taken by ballot; that the knowledge of Colegrove as to the mode in which the vote was taken was his knowledge only as an individual and not in an official capacity and so could not affect the petitioners; that the loss of the town on the three hundred and fifty shares of the stock taken by it, and on the bonds it issued in payment for the stock, could not be set off against the present claim of the petitioners, even if that stock was taken without authority from the legislature; and that under the vote directing the selectmen of the town to guarantee " an amount not exceeding $40,000 " of the bonds, the selectmen were not at liberty to use their discretion as to a less amount, but that the town in the circumstances was bound to guarantee the full amount.

*J. Halsey* and *D. Chadwick,* with whom was *Calef*, for the respondents.

*First.* The vote of the town was unauthorized and void. The record was properly amended to conform to the facts, and as amended was admissible in evidence, and conclusive against the petitioners.

1. The legislature authorized the town to guarantee these bonds, *provided* the town voted by *ballot* so to do, and not otherwise.   The proviso that the vote should be taken by ballot was a condition precedent, without which the power does not exist.   1 Dillon Municp. Corp., §§ 423, 424; *Mercer County* v. *Pittsburgh & Erie R. R. Co.*, 27 Penn. S. R., 389; *Mercer County* v. *Hacket*, 1 Wall., 83; *Starin* v. *Town of Genoa*, 23 N. York, 439.; *People* v. *Batchellor*, 53 id., 128.   The vote was not by ballot, and therefore there was no power to guarantee the bonds.   The evidence to show this was admissible.

It might be shown by parol testimony, because the record is silent on the subject, and does not show in what way the vote was taken. 1 Dillon Municp. Corp., § 237; *Bank of U. States* v. *Dandridge*, 12 Wheat., 64; *United States* v. *Fille-brown*, 7 Peters, 28; *Moor* v. *Newfield*, 4 Greenl., 44; *Third School District* v. *Atherton*, 12 Met., 105, 113. The law attaches much less importance to the entries of the votes and proceedings of towns than to judicial records, and the rules which govern the amendment of the latter do not apply to the former. *Boston Turnpike Co.* v. *Pomfret*, 20 Conn., 590. If not provable by parol, it has been proved by the amended record, which is now a part of the case. 1 Dillon Municp. Corp., §§ 232–239; *Boston Turnpike Co.* v. *Pomfret*, supra. It was the right of the inhabitants of the town to have the record made right. *Chamberlain* v. *Dover*, 13 Maine, 466.

2. The town is not estopped from showing its want of power by reason of the record. The vote of a municipal corporation to subscribe for stock in a railroad company and issue its bonds, does not create a contract between the company and the corporation, even if the vote was upon condition. 1 Dillon Municp. Corp., § 420; 2 id., § 696; *Union Pacific R. R. Co.* v. *Davis County*, 6 Kansas, 256; *State* v. *Saline County*, 45 Misso., 242; *Aspinwall* v. *Daviess County*, 22 How., 366; *People* v. *Coon*, 25 Cal., 635. The original record does not show that the vote was by ballot, but by fair implication shows that it was not. The record, at least, was so uncertain as to put parties interested on inquiry, and whoever is put on inquiry can not claim an estoppel. 2 Parsons Cont., 796; *Epley* v. *Witherow*, 7 Watts, 163. If language is used which bears two constructions, there can be no estoppel unless there is a design to mislead. *Danforth* v. *Adams*, 29 Conn., 107, 111. In this case the clerk recorded, as he supposed, exactly what took place.

3. Nor is the town estopped by reason of the equitable rights of any other parties. There was no mutuality of contract between Chatham and any other town or parties. The vote was not passed contingent upon the votes of other towns

or act of other parties. It was simply that the bonds should be guaranteed whenever the railroad should be built. This court has decided in the case of *Douglas* v. *Chatham*, 41 Conn., 211, that there are no rights which can be enforced, other than those of the railroad company. So that the question in the case lies between the railroad company and Chatham. The ordinary grounds on which municipal corporations are estopped as against innocent holders of bonds, or other negotiable paper, do not exist in this case. That rule applies only where the legislature, in granting power to take stock or issue bonds upon certain conditions, appoints a board to pass upon the question whether the conditions have been performed; there, in a suit on a bond in the hands of an innocent party, the court will not allow the defendant to go back of the action of the board, which has determined that the conditions have been complied with. *Knox County* v. *Aspinwall*, 21 How., 539; *Bissell* v. *City of Jeffersonville*, 24 id., 287; *Van Hostrup* v. *City of Madison*, 1 Wall., 291. Or where a bond refers to the act of the legislature, and recites upon its face that it has been issued in pursuance thereof. *Mercer County* v. *Hacket*, 1 Wall., 83. And it is only in the case of negotiable bonds which circulate from hand to hand, and which have a distinctive commercial character. But even here there must be on the face of the paper an averment that the conditions have been complied with. This doctrine however has no place in controversies which arise *before* the issue of the bonds, between the tax-payers or the municipality on the one hand and the company on the other. In such cases *estoppel has no place*, and the sound doctrine is that compliance with all substantial or material conditions is essential. 1 Dillon Municp. Corp., §§ 108, 381, 382, 415, 426, and cases cited in the notes; 2 id., §§ 740, 766, 767, 768; *Hood* v. *N. York & N. Haven R. R. Co.*, 22 Conn., 502; *Society for Savings* v. *City of New London*, 29 id., 175; *Marsh* v. *Fulton County*, 10 Wall., 676.

4. No action of the selectmen can ratify this act of the town. *Marsh* v. *Fulton County*, 10 Wall., 676; *Stetson* v. *Kempton*, 13 Mass., 272; *Norton* v. *Mansfield*, 16 id., 48; *Parsons* v. *Goshen*, 11 Pick., 396; *Anthony* v. *Adams*, 1 Met., 284.

5. The treasurer of the railroad company and its managing director was present at the meeting, and had full knowledge of the facts in relation to the vote. It seems a strange perversion of justice to hold that, in behalf of the railroad company, the town is estopped by this uncertain record of the town clerk, without any knowledge of the town, when a managing director and treasurer of the company, through whose hands and under whose guidance and control were the making of all contracts and the whole business of the road, had full knowledge that the vote was not taken by ballot.

*Second.* The vote was to authorize and direct the selectmen to guarantee an amount that should " not exceed the sum of $40,000." There is here a discretion given to them to guarantee such part of $40,000 as they, as agents of the town, should deem best. A writ of mandamus may lie to compel them to exercise that discretion, but not to direct as to the amount. 1 Dillon Municp. Corp., § 423; 2 id., § 669; *People v. Tazewell County*, 22 Ill., 147; *St. Joseph R. R. Co.* v. *Buchanan County Court*, 39 Misso., 485.

*Third.* If the town is liable, however, in this proceeding, there should be set off against it the $35,000 subscribed for the stock of the company without any authority of law whatever. The vote to take the stock was passed under a mistake of the town as to its power; a mistake into which it was led and confirmed by the representations of the president of the railroad company. The railroad company cannot, in good conscience, retain the money paid for stock which was then, and is now, worthless. The town could sue and recover it back. *Northrop* v. *Graves*, 19 Conn., 548; *Stedwell* v. *Anderson*, 21 id., 139. But as the railroad company was then and is now insolvent, it would be fruitless to do so. It should then be set off in this action. Mandamus in modern practice is nothing more than an action at law between the parties, and is not now considered a prerogative writ. 2 Dillon Municp. Corp., §§ 663, 667, 706; *Commonwealth of Kentucky*, v. *Dennison*, 24 How., 66, 98. And therefore mutual debts can be set off. *Gilman* v. *Bassett*, 33 Conn., 305; *Fitch* v. *Gates*, 39 id., 366; High on Extr. Leg. Rem., §§ 4, 20. If,

however, it is a discretionary remedy, or has any of the aspects of an equity proceeding, then the rule in actions at law will be adopted in equity.   *Chamberlain* v.  *Thompson*, 10 Conn., 251;  *Spurr* v. *Snyder*, 35 id., 172;  High on Extr. Leg. Rem., §§ 6, 24, 25, 26.   The rights of the parties taking the unguaranteed bonds cannot interfere with the right of set-off.  *Fitch* v. *Gates*, supra;  *Douglass* v. *Chatham*, 41 Conn., 211;  Rev. Statutes, 1875, p. 425, § 14.

PARDEE, J.   The New Haven, Middletown & Willimantic Railroad Company, the petitioner of record, was incorporated by the legislature in 1867, with power to construct and operate a railroad extending from the city of New Haven to the village of Willimantic, the line of its location passing through Middlefield, Middletown, Portland, Chatham and Hebron.   Chatham, the respondent in this proceeding, being thus interested in the construction of the railroad, was author-ized by the legislature in 1868 to loan its credit to the corporation by the issue of its bonds to an amount not exceeding five per cent. of its last completed grand list; and under the authority thus conferred did issue and deliver to the company its bonds, with interest warrants annexed, to the amount of thirty-seven thousand dollars, which principal sum, together with the accrued interest thereon, amounted in October, 1871, to forty thousand dollars.   In the latter part of the year 1870 the company completed its road from New Haven to Middletown and trains were running regularly between those points.   It had nearly finished a bridge across the Connecticut river and had graded a portion of its track through Portland and Chatham, but had laid no rails east of the river and had no means wherewith to purchase them. On the 10th day of November, 1870, the town of Chatham, for the purpose of aiding the company, voted to subscribe for three hundred and fifty shares of its capital stock, and did subsequently so subscribe and pay therefor by issuing its bonds for $35,000 with interest warrants annexed, and de-livering them to the company.   The vote was passed, the stock subscribed for, and the bonds were issued and delivered

to the company, under the belief that all these acts were authorized by the legislature in May, 1870. In May, 1871, the railroad company was again greatly embarrassed, and it then became apparent that unless Portland, Chatham, and other towns through which the line of location passed, could be induced to furnish additional aid to the company, the portion of the line east of the river must be abandoned. Upon the request of Chatham and other towns, the legislature, in 1871, authorized the company to issue its bonds to the amount of two millions of dollars, and to execute a mortgage of its stock, franchises and property to secure the same, and also authorized Chatham and the other towns named to guarantee an amount of the bonds that should not exceed in the aggregate seven hundred thousand dollars.

In execution of the power thus given, the railroad company issued its bonds, with interest warrants annexed, with mortgages to secure the same, all in the form adopted by its directors upon consultation and in concurrence with committees of the several towns, and duly performed the acts to be by it performed under the resolution of the legislature.

On the 14th day of October, 1871, the town of Chatham, in pursuance of a legal warning for that purpose, held a meeting and passed votes, which warning and votes were duly recorded in full in the records of the town. The warning of the meeting, and the votes passed at the meeting, were as follows:—[The warning and votes are given in full in the statement of facts, *ante*, page 467.]

On or about February 13th, 1873, the first train of cars passed over the road from New Haven to the village of East Hampton, within the town of Chatham; and on the 22d of the same month the agent of the company, having $120,000 of its second mortgage bonds, met the selectmen of the town and requested them to place its guaranty upon forty thousand dollars of the same, and offered to deliver the remaining $80,000 thereof to them as collateral security for that act. They declined compliance with the request, for the reason that the company had not complied with the conditions of the vote; and, in fact, at that time the track

had not been laid within its true meaning. The work of construction was thereafter continued and the road was completed and trains were regularly running to the village of East Hampton on the 8th of August, 1873, and to Willimantic, its eastern terminus, in June, 1874.

In October, 1873, the selectmen having been again requested to make the same guaranty, refused, for the reason that $80,000 of the bonds were not ample security for the act; and on the 12th of November, 1874, they refused a like request. On no one of these occasions of presentation did they claim that the vote was taken otherwise than by ballot, or that the record thereof was erroneous or imperfect; and no such claim was made by any one in behalf of the town to the company or to the contractors constructing the road until after the institution of the present proceeding.

From this statement of facts it will be seen that the town desired to rescue a previous large investment in the stock and securities of the company from total loss, and to bring a completed road with its attendant benefits within its limits. For the accomplishment of these purposes, upon its request, the legislature clothed it with power to extend further aid to the company ; the resolution conferring this power prescribing that the voters should pass upon the matter by ballot in town meeting legally warned.

In the warning calling the voters together the selectmen explicitly notify them as to the precise propositions which will be submitted for their action ; that those who are in favor of the adoption thereof will deposit a ballot having the word " Yes " upon it, and that those who are opposed to the adoption will deposit a ballot with the word " No " upon it; and the warning thus specific and precise is spread upon the records of the town, in connection with the record of the votes passed.

The record of the number of persons voting " Yes " and " No " respectively is supplemented by the record of another vote appointing a committee of citizens to receive from the selectmen the endorsed or guaranteed bonds and transfer the same to the railroad company and receive from it a double

amount of its bonds as security for the endorsement; which latter vote is wholly nugatory and idle upon any other idea than that a legal vote for such endorsement had been passed. The town intended that the record, taken together, should mean, and be understood by the public as meaning, that the resolutions were adopted by the number of votes and by the method of voting which would make its action effective in law. It permitted this record thus made to stand from October, 1871, to April, 1875, for the information of the public generally ; and particularly for those who should have occasion to examine it for the purpose of learning if the town had taken the preliminary steps necessary to make its action in this behalf legal and binding and give a value to the bonds which it should thereafter guarantee in pursuance of the vote. Upon the petition of Charles L. Strong, an inhabitant of the respondent town, brought to the Superior Court in Middlesex County, at its April term, 1875, making the present town clerk the respondent, the court ordered him to make this addition to the record made by his predecessor in October, 1871, namely, " Said vote was taken by a division of the house and a count, and not by ballot."

At the time when the vote was passed and the record was made the company had entered into contracts with different persons for work and materials for the completion of the road, and sundry other towns along its line had voted to guarantee certain amounts of its bonds upon specified conditions as to the time when, and manner in which, the money thus provided should be expended. These contracts stipulated for the delivery by the company of the bonds thus to be guaranteed, to the contractors and material-men in certain monthly amounts, proportionate to the work performed and the materials furnished. This fact was known to the various towns, and their votes were passed for the declared purpose of enabling the company to comply with these contracts and of accomplishing the completion of the road, otherwise impossible, and with the understanding that the company, having no other means, should deliver to the contractors for work as it was done, and for materials as they were

furnished and used, these bonds which were thereafter to be made valuable by the promised endorsement. And the company, in accordance with the terms of its contract, from time to time delivered to different contractors and material-men in the aggregate forty thousand dollars of the bonds, with an agreement that the town would endorse them, and with them $80,000 more of the same, to be left with the town as security. The bonds thus delivered and received were then taken as means of payment, and not as payment unless and until they should be endorsed; and therefore the company still has an interest in them and now holds them for the purpose, among others, of enabling it to procure the endorsement and leave a double amount as security with the town. The delivery was accompanied with orders from the company requesting the town to endorse the bonds as being those referred to in its vote·and in fulfillment thereof. These orders were presented to the town together with the bonds, and a double amount of the same for security, and the endorsement asked for by the holders, but no action was taken thereon by the town by way of acceptance or rejection. Its officers and inhabitants knew, after this record was made and exhibited to the public, that the company and the con-tractors under it, relying upon the vote of the town, and upon the record thereof as evidence that it was legally passed, were expending large sums of money and incurring obligations in completing the road, and adding substantial value to property in which the town had made large previous investments, and that the work of construction was carried on wholly upon this pledged assistance from Chatham and other towns in like situation. When asked from time to time to place the guaranty upon the bonds, by the company and by the contractors whom they had seen expending money and performing labor upon the faith of their record, they received the request in silence or refused compliance for varying reasons, but no officer or individual citizen ever gave any notice or even intimation to the company or any person that there was any defect or informality in the manner of passing the vote or any error in the record thereof until the

New Haven, Middletown & Willimantic R. R. Co. v. Town of Chatham.

road had been completed and they had derived all possible benefits from silence.

And the town having made the record for the express purpose and with the design hereinbefore indicated, its officers and inhabitants all having knowledge that the company and the contractors did in fact understand it as importing a vote by ballot, and upon such understanding were expending money and labor in increasing the value of the property of the town, having refrained for more than three years from any effort to correct what they now insist is an erroneous record, and having during the same time neglected to give any notice of a defect in the manner of taking the vote, knowing that such notice would stop such expenditure, they are now, upon the plainest principles of law, estopped both as a municipal corporation and as individuals from setting up against the company which still has an interest in the bonds thus delivered to the contractors and is now seeking to secure the guaranty which it agreed they should have, or against the contractors, any defect in the mode of exercising the power conferred upon them by the legislature, and from altering a record made by themselves and allowed to stand for three years, by which with their knowledge the company and the contractors were induced to believe in the existence of a certain state of things, and so act on that belief as to alter respectively their previous positions.

Indeed the votes, the record, and the subsequent conduct of the town and its inhabitants in reference thereto, considered in relation to the bonds, subject them to the operation of the law of estoppel as completely as if the town had become the makers of the bond and had declared in it that it had complied with all the requirements of the law in issuing it and had allowed it to pass into the hands of an innocent holder. When the legislative grant of power to the town to bind itself, and a declaration of this character concerning the manner of exercising it, co-exist, courts apply the principles of estoppel as strictly and with as much reason to municipalities and their inhabitants as to individuals. *Society for Savings* v. *City of New London*, 29 Conn., 192, and cases there cited.

The case finds also that Allyn M. Colegrove was, on the 14th day of October, 1871, the treasurer and a managing business director of the railroad company, and that he was present at the town meeting held on that day, and knew that the vote was taken otherwise than by ballot; but that he was not there in his official capacity and character, and that his personal knowledge of the fact was not communicated to or known by the other directors of the company, but that they all had knowledge of the form of the vote as it was originally recorded. The respondent insists that by reason of this the company had knowledge at the time of the passage of the vote that it was not taken in accordance with legislative requirement. But Mr. Colegrove was not at the meeting otherwise than in his private, individual capacity; in that capacity he received and retained the information; he was not substituted, and did not in any sense act for the corporation on that occasion; moreover, the town intended that all other directors should, and knew that they did, believe the vote to have been taken by ballot. For these reasons we think the corporation should not be affected by this knowledge of Mr. Colegrove. *Farmers' & Citizens' Bank* v. *Payne*, 25 Conn., 449; *Platt* v. *Birmingham Axle Co.*, 41 Conn., 255, and cases there cited.

It is now urged in behalf of the respondent town that the subscription for three hundred and fifty shares of the stock of the railroad company was made without legislative authority, under a mistaken belief that the power had been conferred, the then president of the company having stated to the meeting at which the vote to subscribe was passed that such was the fact; that therefore the subscription was void, and the company is now justly indebted to the town for the amount paid thereon, and that this indebtedness should be set off against the duty of the town to endorse the bonds. But we cannot yield to this claim. The town voted that it would endorse bonds to an amount not exceeding $40,000, and that these should be used in completing the road. The vote is not qualified by any notice of the existence of a prior incumbrance upon this fund in favor of the town which will exhaust

it.   On the contrary the town intended to make, and explicitly declared that it had made, a new contribution of this sum, additional to its previous investments in all forms, to the resources of the company for the construction of a specifically defined section of its track.   With the knowledge and assent of the town, and in accordance with its intent, the company and the contractors received, accepted and acted upon this declaration that this fund was free from the burden which it now attempts to fasten upon it, and were thereby induced to change their respective positions to their injury; and the town, especially as it has received, retained and still enjoys a portion of the benefits resulting from the expenditure of money and labor, is now estopped, so far at least as the rights of the contractors and material-men are concerned, from asserting the existence of such an incumbrance upon the fund in answer to this petition.   We say " so far at least as the contractors and material-men are concerned," for in reality their rights as well as those of the town and railroad company are involved in the determination of this question. As the latter still has a certain interest in the bonds and the guaranty, and as the form of the town vote and considerations of convenience in carrying it into effect seemed to require the contractors and material-men, who also have rights in and to the same bonds and guaranty, to permit those rights to be represented by and enforced under the name of the corporation, and thus secure at one time one act of endorsement of the whole amount of $40,000, and the presentation of $80,000 as collateral security therefor, this court denied their right to vex the town by separate applications for writs in their individual names, but this matter of form must not conceal the fact that the disposition of this matter largely concerns them.

It is urged also in behalf of the respondent, that inasmuch as the vote of the town authorized and directed the selectmen, to guarantee an amount which should not exceed the sum of $40,000, they were thereby clothed with discretionary power as to the precise amount; and that, although this writ may compel them to exercise that discretion, it cannot direct them as to the amount.   But we are of opinion that there is in fact

no element of uncertainty in the vote; that it defines with precision the duty of the selectmen, and that there is no opportunity for the exercise of discretion.

In the matter of aiding the railroad company by the guarantee of a certain amount of its bonds, the town of Chatham acted in conjunction with the towns of Middletown, Portland, Hebron, and Middlefield. Each of these towns appointed a committee to confer with committees from the other towns in relation to this transaction. It was arranged by these committees that these towns should guarantee in the aggregate $500,000 of the bonds, the proportion assigned to the several towns being as follows; to Middletown, $300,000; to Portland, $102,000; to Hebron, $28,000; to Middlefield, $30,000; to Chatham, $40,000. This arrangement and proportionate division of the burden was made known to the railroad company. The guaranty of any other sum by Chatham is inconsistent with the action of its committee, meeting by its request and direction in the convention of committees of the several towns. Whenever the town has spoken by its committee or its recorded vote, it has mentioned the sum of $40,000; when asked subsequently to its vote to complete the guaranty, it did not object to that amount; no claim was made in its behalf that the vote contemplated any different sum; and we find no difficulty in holding that the legal import of the vote is that the town will guarantee $40,000 of the bonds.

We advise the Superior Court to issue a peremptory mandamus requiring the town of Chatham to execute and place, or cause to be executed and placed, the guaranty of the town upon forty of the second mortgage bonds of the New Haven, Middletown and Willimantic Railroad Company, which shall be presented for such guaranty by the complainants, each to be for one thousand dollars, having annexed thereto semi-annual interest coupons falling due January 1st, 1874, and thereafter until the principal is payable, or in such other form as the parties shall agree, upon receiving from the complainants eighty of the same kind of bonds, each for one thousand dollars, with a like number of coupons annexed as security for the guaranty, and to deliver the forty bonds so guaranteed to the complainants.

In this opinion the other judges concurred; except PARK, C. J., who dissented.

PARK, C. J.     This case presents two questions for consideration.

The first is—Do the facts of the case lay the foundation for an estoppel?

The second is—Is the case one to which the principle of estoppel is applicable?

I think these questions should be answered in the negative, notwithstanding the able and learned opinion of the majority of the court to the contrary.  Let us consider them in their order.

It is said that the respondent town is estopped to claim that, on the 14th day of October, 1871, in town meeting duly warned, the vote was not taken in accordance with the resolution passed by the General Assembly of that year, prescribing the mode by which the town might bind itself to guarantee the bonds of the petitioners to the extent of the investment of the town in the petitioners' company.

It is found as a fact in the case, that on that occasion the town did not vote by ballot; and, consequently, did not in fact bind itself to guarantee any bonds of the company.  But it is claimed as a ground of estoppel that the town clerk made a record upon the records of the town, which shows by fair intendment that the town voted by ballot; and this raises the first question to be considered.

That part of the record important to this controversy is as follows: "At a special town meeting of the legal voters, legally warned and held at the Methodist Episcopal Church in East Hampton, October 14th, 1871, Samuel Skinner, Chairman. *Voted,* That the resolutions prescribed in the warning be adopted, Yes, 178; No, 86."

Does this record show that the vote was taken by ballot? I think not.   Suppose that the moderator had put the question to the meeting as follows: "All those who would pass the resolutions prescribed in the warning say 'Yes;'" and there was a cry over the house, "Yes."   "All those who are opposed

to the passage of the resolutions say 'No;' " and there was a cry over the house, " No." And suppose the moderator, being in doubt which number was the greater, had said, "All those who say 'Yes,' rise and remain standing till you are counted." This being done, the number 178 was reported. "All those who say ' No,' rise and remain standing till you are counted." This being done, the number 86 was reported. Would not the record have been the same as it is now? And would not the same record have been made if the moderator had requested that all those who would say "Yes " occupy seats at the right of the chair, and all those who would say "No " occupy seats at the left of the chair, and the number on each side of the house had been reported? It is very clear that the record would have been the same. When yeas and nays are called for, and numbers are reported, the record must be the same as it is here. These modes of voting are common in town meetings and other assemblies; and how it can be said that this record purports that a ballot was taken, more than it does that the resolutions were passed *vivâ voce*, I am unable to discover. The record is silent in regard to the mode of voting. It merely gives the number of those who voted "Yes" and "No," which it would have to give if any mode was adopted calling for the yeas and nays.

But it is said that the record declares that the meeting was duly warned and held; but the word "held" in the record manifestly has reference only to the place where the meeting was held; "held at the Methodist Episcopal Church " is its language. This is too clear for controversy.

Again, it is said that the record declares that the resolutions prescribed in the warning were passed. But the mode of voting forms no part of either resolution; and how is it possible that there can be any thing in this claim? The record must state that the resolutions were passed, if they had been passed by any mode of voting whatever. It seems to me clear that no one can determine from this record, or from any thing to which it refers, how the vote was taken. He may guess that it was taken by ballot, from the fact that the resolution of the General Assembly so required; and from the further

fact that at the close of the warning it is stated, that the vote would be so taken.   But no legitimate inference can be drawn from either of these facts, that it was so taken, unless the broad claim is made that all town meetings are presumed to have been held and conducted in conformity to law till the contrary appears; which will hardly be claimed.   There is nothing then in this record to indicate the mode of voting but the fact that the number of yeas and nays are given; and this fact is as much in accord with a vote taken *vivâ voce*, as it is with a vote by ballot.   If this be so, then it must be conceded that there is no foundation for an estoppel.   Neither is there any such foundation if the record leaves the fact so in doubt that a man of common prudence and discretion would be put upon enquiry to ascertain how the vote was taken.   Every person is bound to exercise such prudence and care in order to avoid injury to himself; and if he fails in its exercise, and is deceived in consequence to his own injury, when deception was not intended, it is his own fault.

The resolution of the General Assembly was intended for the benefit of the petitioners and other parties interested. They are presumed, therefore, to have known that it specially required the vote of the town by ballot in order to bind the town to guarantee the bonds of the company.   And they did in fact know its requirements; for the case finds that they relied to some extent upon the responsibility of the town. The record made by the town clerk was a public one.   It was open to the inspection of all parties.   The petitioners and all others interested had the same means of ascertaining what had been done by the town and the manner in which it had been done, as the tax-payers of the town who were not present at the meeting.   What peculiar knowledge or means of knowledge had such tax-payers, that the town did not vote by ballot, which the petitioners and others did not have?   They could only have ascertained the fact by inquiry, and in the same manner the petitioners and others interested could have ascertained it.   How then can it be said that such tax-payers are estopped to claim that the town did not vote by ballot, because they did not discover and make known the fact that the town

voted *vivâ voce*, when the claimants could have discovered the same fact with equal ease? The railroad ran through the town. The officers of the company were there on the ground; and indeed their "treasurer and managing business director" attended the town meeting. What foundation then has been laid for an estoppel?

And furthermore, the resolution required that the town should not only vote by ballot, but that the ballot boxes should be kept open for the reception of votes at least two hours. The record made by the clerk on this matter of time is entirely silent. Was not this enough of itself to put the petitioners on inquiry? This condition was as essential to be complied with as voting by ballot. The legislature intended that ample opportunity should be given to the voters of the town to deposit their ballots. Does it not show a carelessness with regard to their interests on the part of the petitioners, if they relied without inquiry on a record which was not only so indefinite in regard to one condition of the proviso, but was wholly silent in regard to another equally essential? I am unable to understand how they can be said to have exercised due diligence in the matter, knowing what the proviso required, and having no evidence whatsoever whether one of its conditions, at least, had been complied with. Inquiry on this subject would have informed them that no ballot boxes were open on that occasion, and no voting by ballot was had. I think no foundation has been laid for an estoppel.

Secondly. But is this case one in which an estoppel can arise? An estoppel concedes that the town did not vote by ballot, but precludes it from showing the fact, and, consequently, takes the fact to be contrary to the truth. If this can be done between the respondents and the railroad company, then the proviso in the resolution is of but little importance. Without it the town would have been bound by its vote; with it the town is bound, it is said, by an estoppel, no matter how it voted. So, it is said, the town is bound, with or without the proviso, although it has never voted as the proviso required. The question then is, whether this town can be bound to guarantee the bonds of the company, otherwise than in the mode particularly prescribed by the resolution.

It should be borne in mind that all the authority the town had to bind itself came from the resolution. Previous to the passage of the act the town might have voted by ballot, over and over again, to guarantee the bonds of the petitioners, and the ballotings might have been recorded at length upon the records of the town, and the petitioners might have relied upon the action of the town, and in consequence thereof might have incurred obligations to contractors and others, and might have proceeded in the construction of their road to its completion; still the town would not have been bound, by an estoppel or otherwise, to guarantee the bonds. The answer to it all would have been, that the petitioners were bound to know that the town had no authority to do what was attempted to be done. No estoppel could exist in such a case. And how does the question here differ from what it would be in that case? The resolution of the General Assembly grants authority to the town to bind itself, provided it exercises the authority in a certain way. The way prescribed excludes by necessary implication every other way, as well by estoppel as otherwise, and is equivalent to an express provision that in no other way shall the town have authority to bind itself. The authority is contingent, and dependent upon balloting. It lies in the ballots, so to speak, and no where else. They, and they only, have the power to bind the town, when used in the manner prescribed. The legislature well knew it was exercising a dangerous power and one of doubtful propriety in granting authority to one class of persons to bind another, against the will of the latter, to guarantee the bonds in question under any circumstances; and it proceeded with great caution in the matter. It intended that in one way, and in one way only, it should be done. It deemed it so essential to the obtaining of a fair decision of the question by the town, whether it would guarantee the bonds, that it made it a condition precedent to the granting of any authority, that the town should vote by ballot upon the question, and withheld all authority till it should so vote. That decision has never been made. Estop the town and you do not have it. The law is interested in the matter as well as the tax-payers, and

it does not mean to be evaded.   It seems to me clear that the case stands between these parties—guarantors and guarantees —precisely as it would have stood if the resolution had never been passed.

It cannot be said that the proviso of this resolution does not make voting by ballot a condition precedent to the granting of authority.   It is so expressed in the plainest terms by the words " provided however."   Every thing else in the resolution is made to depend upon the prior performance of the conditions of the proviso.   Suppose the resolution had been couched in the following language—" Resolved by this Assembly, that when the town of Chatham in meeting duly warned shall vote by ballot to guarantee the bonds of the New Haven, Middletown & Willimantic Railroad Company to the extent of forty thousand dollars, leaving open the ballot boxes for the reception of all proper votes for the space of two hours at the least, then the vote thus taken shall bind the town to guarantee the bonds; but the town shall be bound in no other way whatsoever." Would such a resolution differ substantially from the present one?   Transpose the proviso and read it first, and you have a resolution in all essential particulars like the one I have supposed.   Now could the town be bound by an estoppel under such a resolution, which virtually declares that it shall not be so bound?   It seems to me that this can hardly be claimed. The petitioners and all others interested, dealing with the town under such special and limited authority, would be bound to ascertain for themselves whether the town had, in fact, acted in accordance with the authority given.   The resolution itself would inform them that they must deal with the town as they would deal with minors, married women, or special agents; that should they rely upon the record that the town had so voted, without further inquiry, they would find themselves in the condition of a party contracting with a minor, and relying upon his statement that he had attained his majority.   Who ever heard of a minor being estopped to show his minority?   Or a feme covert to show her marriage? Should a minor represent in making a contract that he was of full age, he might be guilty of fraud, but he would not be

bound by his contract. *Lackman* v. *Wood*, 25 Cal., 147; *Brown* v. *McCune*, 5 Sandf., 224. But it may be said that a minor's non-liability arises from his incapacity to make contracts save those for necessaries. Would he be estopped from claiming that a contract was not for necessaries, if he represented the contrary when it was made? He had authority to make contracts, provided they were for necessaries. This town had authority to guarantee the bonds, provided they voted by ballot so to do. Each had authority within certain limits; but outside of those limits each had no authority. What is the difference, in principle, between the cases? In the case of the minor it would hardly be claimed that he could be estopped. How then can it be claimed in the case at bar? The question is one of power to do the act.

The case is manifestly different from what it would have been if authority had been conferred generally upon this town to guarantee the bonds; and the question was, simply, whether it had voted in any form to do it. Unquestionably the town, in such a case, would be estopped to claim that it had not so voted, if it should appear that a record had been made by the town clerk upon the public records that they had so voted, and the town and its tax-payers had suffered such record to remain till after the petitioners had acted upon the faith of its being true. The controversy then would be in relation to a matter of fact; but here it is in relation to a matter of authority, like the case of the minor or married woman; and the error, it seems to me, consists in confounding the principles of the two cases.

I think that the view I have taken of this question is fully sustained by the authorities. Dillon in his work on Municipal Corporations, Vol. 1st, § 426, after reviewing the authorities, says: "This general survey of the adjudications shows some difference of judicial opinion, (chiefly in cases involving the rights of innocent holders of negotiable municipal securities,) respecting the evidence of the compliance with conditions precedent; and as to what will estop the municipality from showing a non-compliance in fact with such conditions. Yet, aside from these differences, the courts all agree that such a

corporation may successfully defend against the bonds in whosesoever hands they may be, if its officers or agents who assumed to issue them had no power to do so.   The officers of such corporations possess no general power to bind them, and have no authority except such as the legislature confers.   If the statute authorizes such a corporation to issue its bonds only when the measure is sanctioned by a majority of the voters, bonds issued without such a sanction, (either in fact, or according to the decision of the authorized officers or some authorized body or tribunal,) or, when voted to one corporation and issued to another, are void, into whosesoever hands they may come.   This is the sound and true rule of law on this subject, and the one which has had the uniform approval of the state courts in this country, and it has also received the high sanction of the Supreme Court of the United States. The distinction, however, must be remembered between want of power to issue the bonds, and irregularities in the exercise of the power, which are unavailing against the bonâ fide holder without notice of the irregularities."   This is said in relation to bonds in the hands of bonâ fide holders.   With how much greater force could it be said of the petitioners, who were to be guaranteed, and who knew what the proviso required.   Again he says, (§ 108,)  "If the power to issue bonds in aid of railway and other like enterprises does not exist, they are void into whosesoever hands they may come. The power when it has been conferred, to aid or engage in extra-municipal enterprises, being extraordinary in its nature, and burdensome to the citizen, must (at least between all persons except bonâ fide holders of the securities,) be strictly pursued according to the terms and conditions of the grant conferring it."

In the case of *Starin* v. *The Town of Genoa*, 23 N. York, 439, an act had been passed authorizing any town in Cayuga County to borrow money to aid in the construction of a railroad, upon the written consent of two-thirds of the resident tax-payers.   The court, in commenting upon the character of this condition, say:—"Those officers had no power to borrow money, nor to do any of the other acts authorized, until such

assent was so obtained and filed.  This is an absolute prere-
quisite and a condition precedent.  These views lead us to
the conclusion that it was incumbent on the plaintiff to prove
that the written assent given in evidence had actually been
signed by the requisite number of tax-payers designated in
the act, and that the omission to provide such proof is fatal
to the recovery."

In the case of *City and County of St. Louis* v. *Alexander*,
23 Misso., 483, the provision of the act required a submission
of the question to the voters "before the subscription hereby
authorized shall be made."  It was held that this provision
was not merely directory, but was mandatory.  In the case of
*State* v. *Saline County*, 45 Misso., 242, it was held that where
the enabling act required the amount to be specified, a vote
not specifying definitely the amount was, as to the immediate
parties, void.    See also *Mercer County* v. *Pittsburgh Railroad
Co.*, 27 Penn. S. R., 389.

I think the principle of estoppel inapplicable to this case,
and would advise judgment for the defendants.