THE HUTCHINSON & SOUTHERN RAILROAD COMPANY v. THE BOARD OF COMMISSIONERS OF KINGMAN COUNTY et al.

RAILROAD COMPANY,—*Bonds Voted — Railroad Built — Township Estopped.* A municipal township of this state that voted bonds to aid in the construction of a railroad on an agreed line through the township, and made a subscription to the capital stock of the company, and received and retains the certificates of stock issued to it, the proceedings of the board of county commissioners affirmatively showing that all the requirements of the statute authorizing such vote and empowering such subscription had been duly observed, the railroad having been constructed through the township in all respects in strict compliance with the terms of the subscription, and being regularly operated, in an action of *mandamus* to compel the issue and delivery of the bonds voted, is estopped from asserting that the petition presented to the board of county commissioners, requesting an election to be called at which to vote the bonds, was not signed by two-fifths of the resident tax-payers of the township, the board of county commissioners having found and determined at the time of its presentation that it was so signed and was legal in all other respects, and the railroad having been constructed through the township on the faith that all the statutory requirements had been complied with, as shown by the journal of the county board.

*Original Proceeding in Mandamus.*

THE opinion herein, filed February 6, 1892, states the material facts.

*Geo. R. Peck, A. A. Hurd, C. N. Sterry, W. M. Whitelaw,* and *W. M. Wallace,* for plaintiff.

*George W. Cooper,* and *John W. Cooper,* for defendants.

Opinion by SIMPSON, C.: This is an original proceeding in *mandamus,* instituted by the Hutchinson & Southern Railroad Company, to compel the board of county commissioners and county clerk of Kingman county to issue the bonds of Richland township, in Kingman county, in the sum of $13,000, to the plaintiff. These bonds were voted by Richland township on the 27th day of November, 1889, to the Omaha,

Hutchinson & Gulf Railway Company, under the laws of the state of Kansas, as aid to such company in the construction of its railroad through Richland township.   The Hutchinson & Southern Railroad Company, having purchased the railroad property, real and personal, and all the rights, privileges, franchises, etc., of the Omaha, Hutchinson & Gulf Railway Company, now claims these bonds as such purchaser and assignee.   The defendants claim that the plaintiff is not now entitled to such bonds, and ought not to prevail in this suit, for four reasons: First, because the petition on which the bond election of November 27, 1889, was held did not contain two-fifths of the resident tax-payers of Richland township; second, because the notice of the election was defective; third, because the Omaha, Hutchinson & Gulf Railway Company sold out to the Hutchinson & Southern Railroad Company, and the Hutchinson & Southern Railroad Company could acquire no right to such bonds under such sale; fourth, that no demand was made on defendants by plaintiff for the bonds before suit was brought.

Plaintiff contends that two-fifths of the resident tax-payers of Richland township did sign the petition on which the election was called; that due and proper notice of such election was given, but that if the notice was defective, it was an irregularity which was cured by actual notice to the voters of the township, and a very full vote; that the plaintiff has the right to demand the bonds as purchaser from the Omaha, Hutchinson & Gulf Railway Company; that proper demand, oft repeated, was made by plaintiff for the bonds, which was as often refused; that even if two-fifths of the resident tax-payers of Richland township did not sign the petition on which the bond election was called and held, defendants are now estopped from raising any such question.

The original writ in this cause contained the averments that, on the 18th day of October, 1889, a petition (which is fully set out in the writ), signed by more than two-fifths of the resident tax-payers of Richland township, was presented

to the board of county commissioners of Kingman county, praying that such board call an election for the purpose of submitting to the voters of Richland township the question of voting aid to the Omaha, Hutchinson & Gulf Railway Company; that said board duly considered said petition in special session, and determined and found that said petition was signed by two-fifths of the resident tax-payers of Richland township, called the election prayed for in said petition, to be held in Richland township on the 27th day of November, 1889, and ordered the sheriff of Kingman county, Kansas, to give due notice thereof; that said sheriff did give due notice of such election, by proclamation duly published, etc.; that all the voters of said township also had actual notice of such election and attended the polls on the 27th day of November, 1889, and voted, without exception, at said election; that a large majority of such voters voted for the bonds; that the board of county commissioners of Kingman county duly canvassed the returns of said election and declared the result to be that a majority of the votes polled at said election were in favor of the issuance of the bonds, and ordered the county clerk of Kingman county to subscribe to the capital stock of the Omaha, Hutchinson & Gulf Railway Company, for and in behalf of said Richland township, in the sum of $13,000, the amount voted at said election, and that said county clerk did duly make its subscription, as ordered by the board of county commissioners. It is also shown that the railroad was completed through the township on the 27th day of May, 1890, in accordance with the terms of the subscription. The election resulted in favor of the subscription, by a vote of 73 for and 40 against. This action was commenced on the 6th day of December, 1890. Other facts that may be material will be noticed hereafter.

The petition of the resident tax-payers presented to the board of county commissioners, praying that an election be ordered, recites that "We, the undersigned, your petitioners, being two-fifths of the resident tax-payers of the municipal

township of Richland, Kingman county," etc. The board of county commissioners, in ordering the special election, entered on their journal this statement, to wit:

"And having examined said petition, find that the same was in due form, and was duly signed by more than two-fifths of the resident tax-payers of said Richland township, and being regular in all other respects, and the said county commissioners being so satisfied, do so find."

The second, third and fourth defenses relied upon by the respondent township are not good, for various reasons. The objection that the notice of election was defective is met by the showing in the record that every legal voter in the township except one attended the election and cast his vote, and hence had knowledge of the time and place at which the election was held. The third defense, "because the Omaha, Hutchinson & Gulf Railroad Company sold out to the Hutchinson & Southern Railroad Company, and the latter company could acquire no right to the bonds under such sale," is met by the decisions of this court in the cases of *A. C. & P. Rld. Co. v. Comm'rs of Phillips Co.*, 25 Kas. 261; *S. K. & P. Rld. Co. v. Towner*, 41 id. 72; *Bates Co. v. Winters*, 112 U. S. 325; *Scotland Co. v. Thomas*, 94 id. 682; and ¶ 1269, Gen. Stat of 1889. The fourth defense, that no demand was made by the plaintiff of the defendants for the bonds before the suit was brought, is disposed of by evidence contained in the record.

It seems to us, regarding the legal effect of the recitations in this record, that the petition for the election declares on its face that the signers thereof are resident tax-payers; that the board of county commissioners found and determined that the petition was good, and contained the names of two-fifths of the resident tax-payers of the township of Richland; that the election was ordered by reason of that finding and determined by the board; that the election was held, the votes canvassed, and the result declared, and that all this was done without objection or protest from any of the citizens of that township; that the relator presents at least a very strong *prima facie* case for the allowance ôf the peremptory writ, so strong, in fact, that

if the writ cannot be granted, it must be that it is because the township has made such a strong showing that the petition was defective, by reason of not being signed by the requisite number of resident tax-payers, as to completely overcome the *prima facie* case. And in relation to this question, some other facts, and some very strong inferences arising from the record, very vigorously reinforce the *prima facie* showing made by the relator. The tax-roll of that year is introduced in evidence, and this shows that the number of resident tax-payers in the township of Richland was about 70. This tax-roll was made by the township trustee before any proposition for railroad aid was discussed, or, so far as we know, even thought of, and is therefore free from any suspicion that it was made either in the interest of or adverse to such a proposition. Again, the evidence discloses that there were two factions in the township, and that the resident tax-payers were besieged both in favor of and against signing the petition calling for an election; that the attention of the entire population of the township was called to the subject, and that there was an earnest and determined effort made by both factions; and yet we find that the insufficiency of the petition is first alleged after demand is made for the issue of the bonds. These things are so entirely inconsistent with the claim now made of the insufficiency of the petition, that great weight should be given them.

The writer of this opinion has read somewhat carefully the voluminous mass of evidence taken on both sides of this question, and is inclined to the opinion that upon the whole record the petition is sufficient, but the decision of this case is based upon other facts that are indisputable. Many of these facts have been already referred to, and as they are thoroughly established by the evidence, or stated by both parties in such a manner as to be taken for granted, and as some others are asserted and not disputed, they are to be accepted as controlling. We allude to certain facts, independent of the petition for the election, such as the efforts of one party to secure, and the other to prevent, the required number of resident tax-payers to sign the petition; the presentation of the petition to the board of

county commissioners; its allowance; the findings and deter-
mination of the board with respect to its form and legality;
the holding of the election and almost unanimous participation
of the electors of the township in that election; the canvass
and declaration of the result; the subscription of the stock by
the county clerk, as authorized by a resolution of the county
board; the acceptance of that subscription by the railroad
company; the construction and operation of the railroad in
accordance with the terms of the subscription; the acceptance
and retention by the township treasurer of the amount of cap-
ital stock of the railroad company authorized by the subscrip-
tion.    It also appears from the evidence that in consideration
of the subscription of Richland township the railroad company
adopted a route through the township that required them to
make a bend after leaving a village in said township called
"Cleveland," and to turn due east near a certain half-section
line to a certain point near the center of the township, and then
to turn due south and follow a half-section line to near the
southern boundary line of the township, and that this made
nearly a right angle in the road; that the arrangement as to
route was made to satisfy the people of the township; that the
company agreed to locate two depots in the township, one at
Cleveland and one in the center of the township.    The town-
ship is only six miles square.    The company also agreed to
put in two side-tracks.    The route was changed from the orig-
inal intention of the company on account of the subscription of
this township; the route adopted by virtue of the subscription
was from one and a half to two miles longer and more expen-
sive than the original route adopted by the company; the route
through Richland township finally adopted and built and op-
erated would not have been chosen if it had not been influ-
enced and controlled by the expectation of the company to
receive the $13,000 aid voted by the township.    The road was
built through the township on a minimum grade of one foot
to the 100, with compensation for all curves.    First-class ties
were used, 2,640 to the mile, and same number and class in all
side-tracks on the main line.    First-class steel rails, weighing

60 pounds to the yard, were laid on the main line and all side-tracks, manufactured at the Alleghany Bessemer Steel Works. The most approved splice bars — the Sampson splice bars — and Tudor bolts and spikes, were used. The switches were the best that could be bought, and everything connected with the construction was first class. The road is well drained, and, in a word, is a first-class one, and has complied in all respects with the terms of the subscription.

Under this state of facts, can the municipal township urge as a defense to this action that the petition presented to the board calling for an election did not contain the names of two-fifths of the resident tax-payers of the township, and that the finding and determination of the board that it did was incorrect, as a matter of fact, and that therefore the contract of subscription was void for want of power on the part of the board to make it? Every prerequisite of the law affirmatively appearing upon the records to have been complied with, is not the township estopped under all the circumstances of this case from denying the illegality of the petition calling the election? It has been held by this court, in the case of *Sleeper v. Bullen,* 6 Kas. 300, that —

"Where a petition for grading a certain street appears to be good on its face, and the city council of the city decides and declares that it is good, and makes a contract under it, and after the grading has been done, and the city has levied a special tax to pay for the same, the city is estopped from denying the validity of its contract, or of denying its liability to the contractors for the grading."

The authorities quoted to sustain this part of the opinion are the cases of *Louisville v. Hyatt,* 5 B. Mon. 199; *Bissell v. Jeffersonville,* 24 How. 287; *Kearney v. Covington,* 1 Metc. (Ky.) 339; *Swift v. Williamsburgh,* 24 Barb. 427. Later, it is said by this court, in the case of *Stewart v. Comm'rs of Wyandotte Co.,* 45 Kas. 708:

"A land-owner who voluntarily invokes for his benefit the provisions of chapter 214, Laws of 1887, for the purpose of improving a county road contiguous to his land; signs, circulates and presents a petition under the provisions of that

statute to the board of county commissioners and asks for the improvement subsequently made; lives in the immediate vicinity of the improvement during its entire progress; is present upon the work at different times; knows that the petition is insufficient under the statute; and the improvement greatly enhances the value of his property, much in excess of any tax or assessment attempted to be imposed, is not entitled to an injunction to restrain the collection of such tax or special assessment, although the improvement is made without any authority whatever. A party cannot invite and encourage a wrong and then ask a court of equity to protect him by an injunction from the consequences of that wrong."

This is supported by *Sleeper v. Bullen*, supra; *Lee v. Tillotson*, 24 Wend. 337; *Ferguson v. Landram*, 5 Bush, 230; and *Daniels v. Tearney*, 102 U. S. 415; and this case cites Elliott, R. & St. 422; *The State v. Mitchell*, 31 Ohio St. 592; *Burlington v. Gilbert*, 31 Iowa, 356; *Motz v. Detroit*, 18 Mich. 526. See, also, *Brown v. Atchison*, 39 Kas. 37. These cases cited from our own court, as well as the supporting ones, go to the extent that, even when the municipality has no power to make the improvement, the lot-owner may, by his own acts, be estopped from asserting that want of power; and some of the supporting cases hold that where a party has availed himself of the benefits of an unconstitutional law he cannot, in a subsequent litigation with others not in that position, aver its unconstitutionality as a defense. We cite these cases to establish the general rule that courts will carry the doctrine of estoppel to great lengths in the interests of justice, because it has its foundation in a wise and salutary policy. It promotes fair dealing, and often gives triumph to right and justice where no other principle known to our jurisprudence can secure these ends. It is a conservator; and without its frequent operation vast public and private enterprises would be paralyzed. The strength of this principle of estoppel has been held sufficient to overcome jurisdictional defects in proceedings of this kind, as in the case of *Prettyman v. Tazewell Co.*, 19 Ill. 406, where it was alleged that the petition did not contain the requisite number of signatures, and there was not a majority of legal

voters in favor of the proposition.    Also, in the case of *C. D.
& V. Rld. Co. v. Coyer,* 79 Ill. 376, where the petition was in-
sufficiently signed; and in the case of *B. C. R. & N. Rld. Co.
v. Stewart,* 39 Iowa, 267, where the notice of the election was
insufficient; and in *Packard v. Jefferson Co.,* 2 Colo. 336,
where the election was called at an illegal meeting of the board.
In the last case, the court held that the proceedings were with-
out jurisdiction and void, but that the action of the board at
a subsequent regular meeting having treated the proceedings
as valid, they were thereby ratified and validated.    In the
case of *Mills v. Gleason,* 11 Wis. 490, the court says:

"That a subsequent ratification will render valid acts that
in point of strict law were unauthorized when they were done,
is a familiar rule in the case of individuals."

And the court held that it was equally applicable in that
case to estop a city from denying the validity of certain bonds.
And in the case of *Kneeland v. Gillman,* 24 Wis. 39, the court,
speaking of municipal corporations, says:

"As to matters within the scope of their power, the doctrine
of estoppel applies; and that agreements in their behalf may
be ratified by acquiescence and accepting the benefits of them,
with knowledge of the facts, is as well settled as in the case
of natural persons."

And further, in the same opinion:

"If all this was done with the knowledge of the common
council, and it took no action to express any dissent or to pre-
vent its agents from making the agreement, it is as clearly
bound as though it had formally authorized the whole by
express act."

This case is expressly affirmed in *Houfe v. Town of Fulton,*
34 Wis. 618, which is another strong case in support of this
doctrine.   See, also, *Curnen v. City of New York,* 79 N. Y. 511.
In the case of *Peterson v. Mayor of New York,* 17 N. Y. 449,
453, Judge Davis said: "This ratification may be by acts or
conduct inconsistent with any other supposition than that it
intended to own and adopt the act as its own."    See, also,
Story, Agency, § 253; Dill., Mun. Corp., § 385; *Argenti v.*

*San Francisco,* 16 Cal. 255; *People v. Swift,* 31 id. 26; *Hooper v. Bank of Rochester,* 30 N. Y. 83; *Hoyt v. Thompson,* 19 id. 208; *Supervisors v. Schenck,* 5 Wall. 782; *Hart v. Stone,* 30 Conn. 94; *Howe v. Keeler,* 27 id. 538; *Emerson v. Newbury,* 13 Pick. 377; *Hodges v. Buffalo,* 2 Denio, 110; *Dubuque, etc., v. Township,* 13 Iowa, 555; *Detroit v. Jackson,* 1 Doug. (Mich.) 106; *Merrick v. Plank-Road Co.,* 11 Iowa, 47; Herman, Estop., § 554; *Burlington v. Gilbert,* 31 Iowa, 357; *Cross v. City of Kansas,* 90 Mo. 13; *Moore v. Mayor,* 73 N. Y. 238; *Markle v. Clay Co.,* 55 Ind. 185.

This court has laid down this doctrine of ratification in the strongest terms. In the case of *The State, ex rel., v. Comm'rs of Pawnee Co.,* 12 Kas. 426, 439, the court says:

"It is a general principle of almost universal application, that whenever a state, county, corporation, partnership or person has power originally to do a particular thing, it also has the power to ratify and make valid an attempted effort to do such thing, although the same may have been done ever so defectively, informally, and even fraudulently, in the first instance. This principle is so elementary in its nature as to require no citation of authorities to uphold it."

Upon the strength of this principle, municipal corporations have been estopped from denying their liability to pay for benefits received, in some cases, where there was no contract at all; in others, where there was an absence of power even to make the contract. (*City of East St. Louis v. Gaslight Co.,* 98 Ill. 415; *Gas Co. v. San Francisco,* 9 Cal. 469; *Hitchcock v. Galveston,* 96 U. S. 341.) In the last case the supreme court says: "Having received the benefits at the expense of the other contracting party, it [the city] cannot now object that it was not empowered to perform what it promised in return" — citing numerous cases in support of this proposition.

This court has recognized the rule that requires prompt action on the part of the plaintiff in cases of this kind. In the case of *Comm'rs of Morris Co. v. Hinchman,* 31 Kas. 736, this court says:

"It is a well-established rule in equity, that if a party is

guilty of *laches* or unreasonable delay in the enforcement of his rights, he thereby forfeits his claim to equitable relief. Under this rule," says Chief Justice HORTON, "it was decided that an injunction will not be granted to restrain the payment of money illegally voted by a town, if the petitioners had been guilty of gross *laches*, and knowingly have permitted others to incur liability in good faith, relying upon such appropriation for reimbursement."

Citing *Tash v. Adams*, 64 Mass. 252. See also *Thomas v. Woodman*, 23 Kas. 217; *Ritchie v. City of South Topeka*, 38 id. 368; same case, 16 Pac. Rep. 832.

As said by the court in the case of *Kellogg v. Ely*, 15 Ohio St. 67:

" When the first spade had been thrust into the earth in the execution of the contract, before the contractors had expended any money or the laborers any sweat, then, if ever, was the remedy by injunction open to plaintiff below; but he did not invoke it. It does not appear from the record that he ever warned the contractors or laborers that he intended for himself to resist the collection of the assessment which must follow to raise the money to pay them, but, remaining inactive and silent until his swamp lands were drained by a ditch of nearly a mile in length, he then, for the first time, asks the interposition of a court of equity. We think he comes too late."

See also *Chapman v. M. N. & L. E. Rld. Co.*, 6 Ohio St. 137; *The State, ex rel., v. Van Horne*, 7 id. 327; *State v. Union Township*, 8 id. 394; *Goshen Township v. Railroad Co.*, 12 id. 624; *The State, ex rel., v. Goshen Township*, 14 id. 569; *Comm'rs of Knox Co. v. Nichols*, 14 id. 260. Judge Redfield, in his work on Railways, vol. 2, 5th ed., p. 388, says:

"The right to interfere by injunction is one that should always be asserted on fresh suit, or it will be regarded as voluntarily waived and lost by acquiesence."

Citing numerous authorities in support of the proposition.

In 2 Herman on Estoppel, § 1221, the author says:

"If a party is guilty of *laches* or unreasonable delay in the enforcement of his rights, he thereby forfeits his claim to equitable relief. This rule is more especially applicable to

cases where a party, being cognizant of his rights, does not take those steps to assert them that are open to him, but lies by and suffers other parties to incur expenses and enter into engagements and contracts of a burdensome character."

Mr. Daniell, in his Work on Negotiable Instruments, (vol. 2, § 1536,) in speaking of the voting of bonds and the subscribing of stock by municipalities to aid in the building of a railroad, says:

"The tax-payers of the municipality may also enjoin the proceeding of the corporate authorities to carry out the subscription, on the ground of fraud, bribery, non-fulfillment of preëxisting conditions, or other sufficient cause, but they must do so, if at all, in apt time, and before the rights of *bona fide* third parties have accrued."

In *Brown v. Kramer*, 25 N. W. Rep. 356, the supreme court of Nebraska says:

"A tax-payer who seeks to enjoin the payment of money for the erection of a public bridge, which he claims is being constructed in violation of law, must act with reasonable promptness. If he is guilty of gross *laches*, and knowingly permits the contractor to incur liabilities in good faith in the construction of the greater part of the work, an injunction will be denied."

See also *Lamb v. B. C. R. & N. Rld. Co.*, 39 Iowa, 333, where it was held that because the plaintiff had delayed his action until the railroad was completed (as in this case) he was estopped; and in *B. C. R. & N. Rld. Co. v. Stewart*, 39 id. 267, where the election notices were insufficient, the same principle was applied. In the case of *Prettyman v. Tazewell Co.*, 19 Ill. 406, it was held that a delay of four months after the election was fatal to plaintiff's right to enjoin the issue of the bonds; that "the presumption was that rights had been acquired and liabilities incurred on the faith of the bonds that would make it inequitable to restrain their issue." The same principle was recognized in later cases in the same court. (See *Johnson v. Stark Co.*, 24 Ill. 90; *Butler v. Dunham*, 27 id. 474; and *The People, ex rel. v. Cline*, 63 id. 394; *C. D. & V. Rld. Co. v. Coyer*, 79 id. 376.) In the Tazewell county case, the supreme court

of Illinois held, where it was alleged that hundreds of illegal votes were cast, and that there was not a majority of the legal voters in favor of the subscription, that proceedings of this kind are binding until impeached, and that they —

"Might be impeached, . . . by establishing a proper case in apt time; but justice and reason would alike prohibit a party, after acquiescing until the road should incur liabilities, acquire credit, etc., on the faith that these bonds would issue, from impeaching the election and enjoining them from issuing."

And the same doctrine has been recognized and affirmed in later cases in that state. (*Johnson v. Stark Co.*, 24 Ill. 90; *Marshall Co. v. Cook*, 38 id. 48, 51; *The People, ex rel., v. Supervisors of Logan Co.*, 63 id. 374; *The People, ex rel., v. Cline,* 63 id. 394. See, also, *Railroad Co. v. Town of Chatham*, 42 Conn. 465; *Gilmore v. Fox*, 10 Kas. 509, 512; *Kellogg v. Lorain Co.*, 15 Ohio. St. 64; *Chapman v. Railroad Co.*, 5 id. 127, 137; *Clapp v. Cedar Co.*, 5 Iowa, 15; *Markle v. Clay Co.*, 55 Ind. 188.)

The settled policy of this state, both by legislative enactment and judicial expression, is that before the agents of a municipality are authorized to subscribe aid for such public improvements as railroads, they are required to be authorized so to do by the public in the manner provided by statute. (*Township v. Sumner Co.*, 25 Kas. 519.) The preliminary steps required by law, such as a petition signed by two-fifths of the resident tax-payers, an election, and a majority vote, are steps in the creation of that authority, and are steps with which the railroad company necessarily has no connection. (*L. L. & G. Rld. Co. v. Davis Co.*, 6 Kas. 256.) Whether these steps have been legally taken is a question that must be determined by the board of county commissioners, who are public agents to whom the determination of many other important questions is confided. Under the terms of our statute, no other tribunal or authority could determine whether a sufficient petition had been presented, or whether there was a majority vote cast for the subscription. When the board acted, and determined in

favor of the subscription, and ordered the county clerk to make it, and it was accepted by the railroad company, then for the first time was there a contract which necessarily required action by the railroad company. Up to this point, all the proceedings affirmatively show on their face that every requisite of the statute had been complied with; and now we quote largely from a case already cited, that of *Bissell v. City of Jeffersonville*, 24 How. 287—a decision of the supreme court of the United States, decided so long ago, and followed so often, that it is now not assailable. If it should be said that this was a case in which innocent third persons were the holders of the bonds sued upon, the reply is, and it is a patent one, that the court considered the case from the stand-point of the railroad company's rights. The court says:

"Having ascertained and determined that three-fourths of the legal voters had petitioned, they adopted the resolution reported by the committee, and entered into the contract with the railroad company. Clearly, therefore, the common council had contracted the obligation to take the stock; and, in case of refusal, would have been liable in damages for a breach of the contract. . . . It is insisted by the plaintiffs that the defendants had no right to disprove the verity of their own records, certificates and representations concerning the facts necessary to give validity to the bonds. On the other hand, the defendants controvert that proposition, and insist that it was competent for them, under the circumstances, to prove, by parol testimony, that the records given in evidence did not speak the truth, and that, in point of fact, three-fourths of the legal voters had not petitioned, as required by the charter. Unless three-fourths of the legal voters had petitioned, it is clear that the bonds were issued without authority, as by the terms of the explanatory act it could only apply to a case where the common council of a city had contracted the obligation or liabilities therein specified upon the petition of three-fourths of the legal voters of such city; and if no such petition had been presented, or if it was not signed by the requisite number of the legal voters, the law did not authorize the common council to ratify and affirm the subscription. The fact, however, had been previously ascertained and determined by the board to which the petition was originally addressed.

"After the explanatory act was passed, the common council

were fully authorized to revise the finding of the former board;
and if it did not appear, upon inquiry and proper investiga-
tion, that it was correct, it was their duty, as the representa-
tives of the city, to have refused to ratify and affirm the contract
for the subscription.    Such an inquiry might have been made
through the medium of a committee, as it had been when the
petition was presented, or in any other mode satisfactory to
the board which would enable them to ascertain the true state
of the case.    By the terms of the explanatory act they were
authorized to ratify and affirm its subscription, if the obliga-
tion or liability incurred had been contracted on the petition
of three-fourths of the legal voters of the city; and, of course,
the necessary implication is, that they must be satisfied that
the requisite number had petitioned.    .   .   .    Whether
three-fourths of the legal voters had petitioned or not, was a
question of fact; and if not ascertained and conclusively set-
tled before the bonds were issued, it would remain open to
future inquiry, and might be determined in the negative; and
clearly the common council could not lawfully ratify and af-
firm the subscription unless that proportion of the legal voters
had petitioned; and without such ratification the bonds would
be invalid.    Beyond question, therefore, that construction must
be rejected.

"Jurisdiction of the subject-matter on the part of the com-
mon council was made to depend upon the petition, as described
in the explanatory act, and of necessity there must be some
tribunal to determine whether the petitioners whose names
were appended constituted three-fourths of the legal voters of
the city; else the board could not act at all.    None other than
the common council, to whom the petition was required to be
addressed, is suggested, either in the charter or the explanatory
act, and it would be difficult to point out any other, sustain-
ing a similar relation to the city, so fit to be charged with the
inquiry, or one so fully possessed of the necessary means of
information to discharge the duty.    Adopting the language
of this court in the case of *Comm'rs of Knox Co. v. Aspin-
wall*, 21 How. 544, we are of the opinion that 'this board was
one, from its organization and general duties, fit and competent
to be the depository of the trust confided to it.'    Perfect ac-
quiescence in the decision and action of the board seems to
have been manifested by the defendants until the demand was
made for the payment of interest on the loan.    So far as ap-
pears, they never attempted to enjoin the proceedings, but
suffered the authority to be executed, the bonds to be issued,

and to be delivered to the railroad company, without interference or complaint.

" When the contract had been ratified and affirmed, and the bonds issued and delivered to the railroad company in exchange for the stock, it was then too late to call in question the fact determined by the common council, and, *a fortiori*, it is too late to raise that question in a case like the present, where it is shown that the plaintiffs are innocent holders for value.

"Duly-certified copies of the record of the proceedings were exhibited to the plaintiffs at the time they received the bonds, showing to a demonstration that further examination upon the subject would have been useless; for, whether we look to the bonds or the recorded proceedings, there is nothing to indicate any irregularity, or even to create a suspicion that the bonds had not been issued pursuant to lawful authority; and we hold that the company and their assigns, under the circumstances of this case, had a right to assume that they imported verity.

" Citation of authorities to this point is unnecessary, as the whole subject has recently been examined by this court, and the rule clearly laid down that a corporation, quite as much as an individual, is held to a careful adherence to truth in their dealings with other parties, and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct has superinduced."

It will be noticed that this case is cited and strongly relied upon by this court in *Sleeper v. Bullen*, 6 Kas. 300; and in the more recent cases of *Water-Works Co. v. City of Burlington*, 43 id. 725; *Brown v. Atchison*, 39 id. 48, and *The State, ex rel., v. Dennis*, 39 id. 509, it is very strongly asserted that contracts with innocent persons made by municipalities cannot be avoided by defects that are shown outside of the record.

In the case of *Bill v. City of Denver*, decided by Mr. Justice Brewer, and reported in 29 Fed. Rep. 344, there is a decision in harmony with that of *Sleeper v. Bullen*, supra. It was an action against the city of Denver for services as inspector of sewers; the defense was that it had no power to make

:such a contract. Justice BREWER comments on this defense, .and says:

" It is true that its power to proceed in the premises depended upon the petition of a majority of the property-owners; but no tribunal is in terms provided to determine whether such petition has been filed; and there being no statutory provision for a tribunal to so determine, when the city council as the general representative of the city, with power to act thereon, determined by its action that such a petition has been filed, third parties have a right to rely upon that, and say that the city is estopped thereafter to deny that such petition was filed."

We again quote from the supreme court of the United States:

" The function of making the subscription and issuing the bonds was confided to the county court. They had jurisdiction over the entire subject. They were clothed with the power and duty to hear and determine. The power was exercised and the duty performed. In this case, as it is before us, the result is conclusive; and the county is estopped to deny that such is the result." (*County of Macon v. Shores,* 97 U. S. 279.)

It seems clear to us that, under the authorities, the doctrine of equitable estoppel applies, and should be applied in this case, but we desire to call attention to some of these authorities, making copious quotations from them, as follows:

"Corporations, as much as individuals, are bound to good faith and fair dealing, and the rule is well settled that they cannot by their acts, representations or silence involve others in onerous engagements, and then turn around and disavow their acts, and defeat the just expectations which their own conduct has superinduced." (*Railroad Co. v. Howard,* 7 Wall. 392–413.)

"It must be further borne in mind, that the invalidity of contracts made in violation of statutes is subject to the equitable exception that, although a corporation in making a contract acts in disagreement with its charter, where it is a simple question of capacity or authority to contract, arising either on a question of regularity, or organization, or of power conferred by the charter, a party who has had the benefit of the

agreement cannot be permitted in an action founded on it to question its validity." (*Township of Pine Grove v. Talcott*, 19 Wall. 666–678; *National Bank v. Matthews*, 98 U. S. 621–629.)

"The plea of *ultra vires*, as a general rule, will not prevail, whether interposed for or against a corporation, when it will not advance justice, but, on the contrary, will accomplish a legal wrong. . . . It is now very well settled that a corporation cannot avail itself of the defense of *ultra vires* when the contract has been in good faith fully performed by the other party, and the corporation has had the full benefit of the performance of the contract." (*Arms Co. v. Barlow*, 63 N. Y. 63.)

"The rule seems to be well established, that where a contract has been executed and fully performed on the part either of the corporation or of the other contracting party, neither will be permitted to insist that the contract and such performance by one party were not within the corporate power of the company." (*Hays v. Coal Co.*, 29 Ohio St. 330.)

"As we understand the rule, *ultra vires* prevails in full force only where the contracts of corporations of this character remain wholly executory. . . . This rule prevails even as to public or municipal corporations, in analogous cases." (*Thompson v. Lambert*, 44 Iowa, 239.)

In Ohio, in the case of *The State, ex rel., v. Van Horne*, 7 Ohio St. 327, the court states the doctrine very fully:

"No objection is interposed by the defendant, either to the legality of the election, or to any irregularity in form or substance of the certificate of the trustees of the township filed in the auditor's office and recorded; nor to the subscription, the issuing of the bonds, their sale, or the receipt of the money from the purchasers of the bonds. But the defendant says that no election could be had until the line of railroad was actually established and located through the township, and that, consequently, the whole proceedings were unauthorized and void.

"It is, perhaps, a question of some doubt whether the general assembly did not intend that the railroad should be actually established through a township before an election; but we do not consider it necessary in the case before us to decide that question, as we are of the opinion that, conceding a location would have been necessary before an election, the acts of the

parties interested have been such as to preclude them from denying the authority and power of the trustees of the township to issue the township bonds. If the location of the road should have been first made, any tax-payer of the township, for himself and all others interested, could at any time before the issuing or negotiation of the bonds have intervened, and enjoined their issue as unauthorized, on account of the road not having been located. They, however, either intentionally or from neglect to assert their legal rights, without protest or interference, suffered the election to take place, their public agents, the trustees, to subscribe for stock, to issue the bonds, and receive the proceeds. . . . They now desire to retain the money of the original bondholders; refuse to pay interest; deny their obligation to pay back the principal; disaffirm the acts of their public agents who, under the forms of the law, and by their direct instigation — through the ballot-box, issued and negotiated these bonds. They had an opportunity, before innocent third persons could be injured or committed to the acts of their public agents, to enjoin their proceedings and protect themselves. They did not seek that protection; but now, when they have received all the fruits of the contracts of their agents from third persons who have acted upon their recognition of the authority of their agents, they ask the privilege of denying this recognition, and thus escape from their obligations. It is too late for them to do so as against innocent third persons. They are concluded, not simply by the acts of their public agents, but by their own.

"It is true that, when public officers exceed the powers vested in them by general laws, their acts are no longer official, but void; and this principle would be applicable to the case before us if the trustees had derived their sole authority to make the contract under consideration from the law, without any interposition, sanction or authority from the tax-payers of the township. But in the case before us the trustees derived their authority to subscribe for the stock of the railroad and to issue the bonds specifically from their constituency, the tax-payers of the township. The trustees, unless authorized by the tax-payers, derive no authority to act from the laws under consideration. In fact, the whole transaction under the legislation was for the purpose of consummating an agreement having all the substantial elements of a private contract between the tax-payers as principals, who by vote made the trustees their agents to contract for them, on one side, and the railroad and the bondholders on the other. The

rules of law applied to individuals, and founded upon the clearest principles of justice and sound morals, should be equally applicable to these parties. The tax-payers, as principals, who by their votes under the forms of law set their agents in motion, professed to clothe them with special authority to make a special contract with third persons for their benefit, by voting, instigated those agents to make the subscription and issue the bonds, and thus induce, on the faith of this recognition, innocent third persons to part with their money and receive in lieu thereof these bonds. If the trustees of the township and the tax-payers supposed until recently, as they probably did, that the subsequent permanent establishment and location of the railroad through the township was sufficient to authorize the issuing of the bonds, whether that location was made before or after the election, it is equally just to presume that the bondholders who parted with their money entertained the same belief. The one were certainly as much bound to know as the other; and if both were mistaken, no principle of law or justice would demand that the tax-payers should retain the fruits of the mistake, and at the same time repudiate those very acts of their own which misled the bondholders, and induced them to part with their money; in truth, blowing hot to get the bondholders' money, and blowing cold to rid themselves of the obligation to refund it."

This case was followed and approved by the same court in the case of *State v. Union Township*, 8 Ohio St. 394; also by the same court in the case of *Goshen Township v. Railroad Co.*, 12 Ohio St. 624. It was also followed and approved in the case of *The State, ex rel., v. Goshen Township*, 14 Ohio St. 569. The fourth point in the syllabus in the last case is as follows:

"Acts of subsequent acquiescence and ratification will estop the township from objecting to the validity of the bonds in the hands of an assignee for value who has taken them on the faith of such acquiescence, on account of any irregularities attending their execution and issuing, short of such an absence of power or such an illegality as would render them absolutely void. And notice on the part of the assignee will not defeat the estoppel."

See, also, the case of *Comm'rs of Knox Co. v. Nichols*, 14 Ohio St. 260.

In Missouri, the same doctrine has been asserted in a case between a municipality and a railroad company itself, it being the case of *H. & St. J. Rld. Co. v. Marion Co.*, 36 Mo. 294, in which case, Judge Wagner, speaking for the court, uses the following language:

"The rules which regulate the business transactions of life, and which enjoin good faith, honesty, and fair dealing, are alike applicable to individuals and corporations. The county of Marion, to aid a great public undertaking, which was to redound to the interest of its citizens, subscribed stock in a railroad enterprise. Like all other shareholders, it received a certificate of stock, and now retains and holds the same, and continues to enjoy all the benefits derivable therefrom. Upon the strength of that subscription, large sums have been expended, and important investments made. It would be grossly immoral and unjust to allow it to involve others in onerous engagements, and then, after a lapse of 10 years of silent acquiescence, repudiate its obligation."

This was approved and followed by the same court in the case of *Steines v. Franklin Co.*, 48 Mo. 167; and, also, in the case of *Barrett v. Schuyler Co.*, 44 id. 197.

In Pennsylvania, the same doctrine is asserted; and in the case much cited in the text-books, to wit, the case of *Alleghany City v. McClurken*, 14 Pa. St. 83, the court uses the following language:

"The charter or act of assembly incorporating the city of Alleghany was not produced or read on the argument; but I take it for granted that it contains no express authority to the corporation to issue such notes as those embraced in this action. But it does not follow that the corporators are therefore not answerable for them in their corporate capacity. They have received value for them, in the various public works and improvements erected and made in the city through their instrumentality, and it hardly comports well with fair dealing that they should seek to exonerate themselves from a debt on this account contracted by and through their accredited agents, and with their silent acquiescence. It is not universally true that a corporation cannot bind the corporators beyond what is expressly authorized in the charter. There is power to contract, undoubtedly, and if a series of contracts have been made

openly and palpably within the knowledge of the corporators, the public have a right to presume that they are within the scope of the authority granted. A bank which has long been in the habit of doing business of a particular description would not be exonerated from liability because such business was not expressly authorized in its charter. The object of all law is to promote justice and honest dealing, when that can be done without violating principle.

"I cannot perceive that any principle is violated by holding a corporation liable for the contracts of its accredited agents, even not expressly authorized, when these contracts for a series of times were entered into publicly, and in such a manner as by necessary and irresistible implication to be within the knowledge of the corporators. It was the acquiescence of the corporators, and the habit and custom of business with the corporation, which induced the public to give credit to the scrip or notes, which was evidence of contract. But when to this circumstance we add that the corporators themselves received the value of these notes or contracts, in erection of improvements in the city, and enjoyed and still enjoy the value of them, the conclusion is irresistible that the corporators ought to pay them by the assessment of taxes on the corporators, if it has no other available means."

Again, in the case of *Commonwealth v. Pittsburg*, 43 Pa. St. 391, the court says:

"Where a subscription to the stock of a railroad company on behalf of the city is authorized by ordinance to be made on certain conditions precedent, the subsequent issue of bonds in payment of the subscription proves the conditions to have been complied with or waived by the city."

This doctrine of equitable estoppel was strongly approved in a very strong opinion in the case of *Town of Bennington v. Parks*, 50 Vt. 178. In that case the railroad company that received the bonds was held to be a *bona fide* purchaser for value, on the ground of its right to rely upon the records made by the agents of the town.

In Illinois, the same doctrine is maintained in the cases of *Prettyman v. Tazewell Co.*, 19 Ill. 406, and *Johnson v. Stark Co.*, 24 id. 90. The principles announced in each of these cases were distinctly affirmed in the case of *Butler v. Dunham*,

27 Ill. 474, which was an action brought by tax-payers to en-join the issuance of bonds; and the same principle finds rec-ognition in the case of *People, ex rel., v. Cline,* 63 Ill. 394. In the case of *City of East St. Louis v. Gaslight Co.,* 89 Ill. 415, following is the first point in the syllabus:

"Although there may be a defect in the power of the corpo-ration to make a contract, yet, if the contract made by it is not in violation of its charter, or of any statute prohibiting it, and the corporation has by its promise induced a party relying on the promise and in execution of the contract to expend money and perform his part thereof, the corporation will be liable on the contract."

In Wisconsin, the same doctrine has been enunciated, and in the case of *Houfe v. Town of Fulton,* 34 Wis. 618, the fol-lowing proposition is stated in the opinion of the court:

"But of late years, much more than formerly, the doctrine of estoppel — most wholesome and just in its operation when properly applied — has been extended to these municipal cor-porations, so as to bind and conclude them by their own acts and acquiescence, and the acts and acquiescence of their officers, whenever an estoppel would exist in the case of natural per-sons. It is now well settled that, as to matters within the scope of their powers and the powers of their officers, such corpora-tions may be estopped upon the same principles and under the same circumstances as natural persons. (*Kneeland v. Gilman,* 24 Wis. 39.)

"The estoppel in such cases arises from the acts of the town and its officers, performed within their apparent authority, and if they, who ought to know, were deceived and mistaken, it would be most inequitable and wrong to visit the consequences upon innocent third persons who relied upon and were justified in confiding their action."

In Indiana, the same doctrine has received recognition. The city is estopped by the record of the common council, which declares that more than two-thirds of the resident free-holders of the city petitioned. (*McCullough v. The State,* 11 Ind. 424.) In the case of *Muncey v. Joest,* 74 Ind. 413, a party applied to enjoin the assessment of a tax levied to pay for the construction of a drain ditch, on the ground that there

were irregularities in the matter which prevented the officers from rightfully constructing the ditch, such as failure to give certain notices that were required to be given, etc. And the court says:

"As the appellant made no objection until after the work had been fully completed, he is not now in a situation to complain of the insufficiency of the notice of the letting of the contract. Having received the full benefit of the work done by the contractor, he cannot now escape payment on the ground that proper notice of the letting of the contract was not given. It is a well-settled rule of equity, that if a party is guilty of *laches*, or unreasonable delay in the enforcement of his rights, he thereby forfeits his claim to equitable relief. The rule is more especially applicable to cases where a party, being cognizant of his rights, does not take those steps to assert them which are open to him, but lies by and suffers other parties to incur expenses and enter into engagements and contracts of a burdensome character. This doctrine has been adopted and enforced by this court"—citing a number of cases, and cases in other states.

The doctrine is also adopted by the state of New York, as will be shown by the following quotation from the case of *Curnen v. City of New York*, 79 N. Y. 511:

"A fact admitted by a municipal corporation through its officer, duly and properly acting within the scope of his authority, is evidence against it, and cannot be withdrawn to the prejudice of one who, in reliance upon it, has changed his position in respect to the matter affected thereby. The doctrine of estoppel applies in such case to a corporation as well as to an individual."

In California, the same rule is announced, as will be seen by the following quotation from the case of *Argenti v. City of San Francisco*, 16 Cal. 256:

"As a rule, the powers of corporations must be exercised in the mode pointed out by the charter. But even a want of authority is not in all cases a sufficient test of the exemption of the corporation from liability in matters of contract. An executory contract made without authority cannot be enforced; but where the contract has been executed, and the corporation has received the benefit of it, the law interposes an estoppel,

and will not permit the validity of the contract to be questioned."

In 1847, the legislature of the state of Massachusetts enacted the following law:

Ch. 37, Sec. 1: "Whenever any city or town shall have voted to raise by taxation, or by pledge of its credit, or to pay over from moneys in its treasury any sum or sums of money for any other purpose or purposes than those for which it may have the legal right and power so to do, the supreme judicial court shall have power, upon the suit or petition of any inhabitants not less than 10 of said city or town liable to be taxed therein, briefly setting forth the cause of complaint, to finally hear and determine in equity all such cases; and any justice of said court may, as well in vacation as in term time, issue an injunction and make all such orders and decrees as may be necessary or proper to restrain or prevent any violation or abuse of said legal right and power of such city or town, until the final determination of such causes by the supreme judicial court; and no order or decree of said court or of any justice therein shall be discharged or invalidated on account of want of jurisdiction in said court or justice."

The case of Tash and others against Adams, treasurer, was brought under this statute; and as the case is so applicable, we will quote the entire opinion, which was delivered by Justice Bigelow. The opinion will be found in 10 Cushing, p. 252:

"The petition in this case is filed pursuant to the statute of 1847, (chapter 37, section 1,) which empowers this court to hear and determine in equity all cases relating to the raising and expenditure of money by towns for any purpose not authorized by law. The petitioners set forth two votes of the town of Natick making appropriations of money for objects alleged to be illegal and unauthorized, and ask for a perpetual injunction against the town and its officers, restraining the payment of any money from the treasury, and prohibiting the pledge of the credit of the town under said votes and appropriations.

"It will be necessary, for a just decision of the case, to consider the two votes separately. The first was passed at a meeting of the inhabitants of the town, duly called, on the 18th of September, 1851, and appropriated the sum of $500 for the celebration of the second centennial anniversary of the

settlement of said town, and authorized a committee appointed to arrange the celebration to draw from the treasury of the town an amount not exceeding that sum to defray the expenses thereof. It appears that this committee, acting under this vote, proceeded to make contracts for and in behalf of the town, and expended money, and became liable to pay, on account thereof, a sum amounting to $463; that the celebration took place on the 8th of October, 1851, under the sanction of the town, and that all the expenditures were made and liabilities incurred prior to that time; that the committee acted in good faith, in strict accordance with the terms of said vote, and in the belief that the town had the legal right and power by law to authorize them to expend money and make contracts in behalf of the town for the purpose aforesaid. It further appears that the petitioners in the present case were inhabitants of said town, and fully cognizant of said vote at the time it was passed, and of the proceedings of the committee under and by virtue thereof; that they took no measures to prevent said committee or said town from acting in pursuance of said vote; that they stood by and permitted said contracts to be made, the credit of the town to be pledged, and said money expended as aforesaid, and after said celebration had taken place, and said committee and other persons had become personally liable to pay money under said proceedings, to wit, on the 18th day of October, 1851, the said petitioners made application to this court for an injunction, as above stated.

"Upon these facts, we think it very clear that the petitioners are not in equity entitled to the relief which they seek. So far as relates to this vote and appropriation by the town, assuming that the purpose for which the money was appropriated was illegal, because it was one for which towns are not authorized to incur expenditures or raise money, (upon which question we express no opinion,) nevertheless the petitioners fail to make out a case entitling them to the interposition of the court.

"It is a well-established rule in equity, that if a party is guilty of *laches*, or unreasonable delay in the enforcement of his rights, he thereby forfeits his claim to equitable relief. This rule is more especially applicable to cases where a party, being cognizant of his rights, does not take those steps to assert them which are open to him, but lies by and suffers other parties to incur expenses and enter into engagements and contracts of a burdensome character. (2 Story on Eq., § 959; Drewry on Injunctions, 294.) The facts bearing on this part

of the case, as presented by the petitioners, bring it very clearly within the operation of this salutary rule. The petitioners not only failed to use due and reasonable diligence in asserting their rights and seeking a remedy, but were guilty of gross *laches*. With a full knowledge of the vote of the town, and the proceedings of the committee, they permitted contracts to be made and expenditures to be incurred, not only by the committee but by third parties, who acted in good faith, relying on the credit of the town. They took no measures to enforce their rights until after the celebration had taken place, and innocent parties had come under liabilities which they would not have assumed if the petitioners had seasonably sought redress for the impending grievance. To issue an injunction to restrain the payment by the town of the bills thus incurred would be manifestly most inequitable. So much, therefore, of the prayer of the petition as applies to the vote and appropriation of September 18, 1851, must be denied.

"That part of the case which relates to the vote of the town passed October 17, 1851, appropriating the sum of $500 for the celebration of the anniversary of the surrender of Cornwallis, stands upon wholly different grounds. It is not contended that this appropriation was for a purpose for which a town can legally expend money or pledge its credit. It was clearly a violation of law, and without any sanction derived from the usages of towns in this commonwealth. The application for the injunction, having been made immediately after the vote was passed, and before any money was expended or liabilities were incurred in pursuance thereof, was seasonably presented. In fact, the case finds that the money actually raised and expended for the celebration was furnished by subscription, upon the condition that it should be refunded by the town, if the decision of the present case should authorize its being drawn out of the treasury. All parties, therefore, have acted at their peril, with full and timely notice that the proceedings of the town in appropriating the money were to be drawn in question before the proper tribunal. This presents a suitable case for the interposition of the court, under the powers granted by the statute, and a perpetual injunction must issue to restrain and prohibit any expenditure of money, or pledge of the credit of the town, under the vote of October 17, 1851."

In Iowa, the same doctrine has been asserted, in the case of

*Lamb v. B. C. R. & N. Rld. Co.*, 39 Iowa, 333, which was an
action brought by a tax-payer to enjoin the railroad company
from receiving the fruits of its subscription, on the ground
of irregularities which vitiated the contract.　The court uses
the following language:

"There is still a further ground upon which the action of
the district court may be sustained and affirmed.　It is this:
The tax was voted in January, 1872; the work of construct-
ing the railroad on the faith of the tax was completed within
a year; the plaintiff remained silent until all the benefits which
would accrue to him were secured, and then, 14 months after
the vote, he seeks to enjoin the collection of the tax, and
thereby relieve himself from the payment of that upon the
faith of which he knew the work was being done.　These
facts work an equitable estoppel, as we have before held."

And the case of *B. C. R. & N. Rld. Co. v. Stewart*, 39 id.
267, was a case in which the same proposition was determined
against a tax-payer who alleged that the notices for the elec-
tion were wholly insufficient, it being a suit between the rail-
road company and the tax-payer.

In Connecticut, the same doctrine is recognized and fol-
lowed in a very strong opinion, in a case between a munici-
pality and a railroad company, being the case of *Railroad Co.
v. Town of Chatham*, 42 Conn. 465.　The court uses the fol-
lowing language:

"The town of Chatham, for the purpose of aiding in the
completion of a railroad that was in the course of construction
through the town, and which was in an embarrassed condition,
passed a vote, under authority of the legislature, to guarantee
not exceeding $40,000 of certain bonds which the railroad
company was authorized to issue; such guaranty to be made
after the road was completed.　The resolution authorizing this
action of the town provided that the votes should be by ballot,
and the warning of the town meeting, which was recorded upon
the records of the town, stated that the vote would be so taken;
that ballot-boxes would be open for the purpose, and that
those in favor of the proposition would deposit ballots with
'Yes' upon them, and those opposed, ballots with 'No' upon
them.　The record of the meeting, by the town clerk, was that
'Resolution was adopted; yes, 178; no, 86.'　The vote was

in fact taken by a division of the house, and not by ballot; but neither the officers of the town nor any person in its behalf ever claimed or gave notice that it was not taken by ballot until more than three years after, and until long after the railroad had, in good faith, and with knowledge of all the inhabitants of the town, issued the bonds which were to be guaranteed, and delivered them to contractors who had performed work, furnished materials and expended money in reliance upon them; the contractors taking them with an order upon the town for its guaranty of them when the work was completed. *Held*, That the town was a municipal corporation, and the inhabitants of the town were estopped from claiming that the vote was not legally taken; and *held*, that the town was estopped from availing itself of a correction of the record of the town clerk, afterward made under an order of the superior court, upon the application of one of the taxpayers of the town, showing that the vote was taken by a division of the house, and not by ballot. It appeared that when the vote was taken the treasurer and managing director of the railroad company was present, and saw how it was done; but that he was not acting officially, and that his knowledge was not conveyed to any of the other directors of the company. *Held*, That the railroad company was not affected by his knowledge."

While there are other authorities that have been either cited at the bar, or examined by the court, on this question, we have given a sufficient number of what we regard as the most important cases to authorize us to say that the overpowering weight of modern judicial opinion is to the effect that, assuming the illegality of the petition, the other acts of the munici-

Township estopped.

pality, and its silence and non-action, as heretofore recited, are amply sufficient to estop it from asserting that illegality in this action. The other acts of the municipality referred to are as different as the reported cases, but those acts most common to all the cases are the reception and use of the benefits of the contract, the enjoyment of the labor of others, failure to protest or to commence legal proceedings in apt time, the retention of the stock, and general acquiescence in all proceedings until the contract becomes wholly executed. In this case, it is almost safe to aver that

every element of silence, acquiescence, enjoyment of the labor of others, neglect to protest or litigate, recognition, ratification, retention of stock, and all other acts that call for the application of the principle of estoppel, have been established as indisputable facts by this record, and have such controling force that we are compelled to recommend the issuance of the per-emptory writ.

By the Court: It is so ordered.

All the Justices concurring.